MINNIE O'CONNOR v. JOHN B. M. SILL.

*Libel—Article charged as libelous, must be all read together—Its spirit must be determined, largely, from the occasion which led to it— Criticism of teacher—When not libelous.*

1. Private persons cannot be lawfully made the subject of ill-natured remarks, in the public press, where they have done nothing to expose themselves to public censure; and where such things are published as have an injurious tendency, the persons giving them publicity must find some justification, or be responsible for the mischief.

2. In order to try the libelous quality of an article, it must all be read together. Parts of it cannot be severed from the rest, so as to give them a meaning which the whole would not justify; and the spirit

of the whole article must be determined, largely, from the occasion which led to it.

8. Upon a review of the facts appearing in this record, the publication complained of was held not libelous, the comments made not exceeding the bounds of legitimate criticism, in view of the surroundings of the parties.

Error to Superior Court of Detroit. (Chipman, J.) Argued February 10, 1886. Decided February 17, 1886.

Libel. Plaintiff brings error. Affirmed. The facts are stated in the opinion.

*Walter Barlow*, for appellant:

Defendant, under the testimony, was responsible for the publication and for its results, if libelous: *Clifford v. Cochrane*, 10 Ill. App. Ct. 570; and words, not actionable in themselves, may become so if spoken of one engaged in a particular calling or profession: Id. 574. The language used tended to impair the credit to be given to the conversations held with the plaintiff, and charges her with incapacity as a teacher of the art of drawing, and tends to injure her in such profession. No other conclusion can be arrived at from a careful review of the authorities on this subject: *Ostrom v. Calkins*, 5 Wend. 262; *Demarest v. Haring*, 6 Cow. 76; *Chaddock v. Briggs*, 13 Mass. 247; *Chipman v. Cook*, 2 Tyler, Vt. 456; *McMillan v. Birch*, 1 Binney, 178; *Day v. Buller*, 3 Wils. 59; *Onslow v. Horne*, Id. 177; *Weiss v. Whittemore*, 28 Mich. 366, 375; *Foster v. Scripps*, 39 Mich. 376; *Trimmer v. Hiscock*, 27 Hun, (N. Y.) 364; *Fitzgerald v. Redfield*, 51 Barb. 484; *Hetherington v. Sterry*, 28 Kan. 426; *Brooks v. Bemiss*, 8 Johns. 455; *Williams v. Karnes*, 4 Humph. (Tenn.) 11; *Cooper v. Greeley*, 1 Den. (N. Y.) 347. The injury to the reputation is the gist of the action: Odgers on Libel and Slander, pp. 17, 18; *Detroit Daily Post Co. v. McArthur*, 16 Mich. 452.

The article was not a privileged communication, not being in response to anything said or written by the plaintiff concerning the defendant: Odgers on Libel and Slander, pp. 228, and 306, and cases under note "A"; *Miller v. Johnson*, 79 Ill. 58; *Flagg v. Roberts*, 67 Ill. 485; *Bourland v Eidson*, 8 Gratt. 31; *Underhill v. Taylor*, 2 Barb. 348; *Haws v. Stanford*, 4 Sneed (Tenn.) 520.

Defendant could only complain to the board of edu-

cation of plaintiff's unfitness to hold her position in the public schools, while her name was before the board for reappointment, and even then only on reasonable grounds, and without malice: *Foster v. Scripps*, 39 Mich. 376; *Hunt v. Bennett*, 19 N. Y. 173. In communications made in self-defense, it must clearly appear, not only that some such communication was necessary, but also that the defendant was compelled to employ the libelous words complained of. If he could have done all his duty, or all that interest demanded, without libeling the plaintiff, then the words were not uttered in the due performance of any duty, hence not privileged: Odgers on Libel and Slander, 224; and such privilege may be lost if the extent of the publication is excessive; or, if defendant's object could have been equally well effected by a publication which did not contain the libelous words, then the extent given to such publication is evidence of malice to go to the jury: Odgers on Libel and Slander, 225; *Brown v. Croome*, 2 Stark, 297; *Elam v. Badger*, 23 Ill. 498.

*C. A. Kent*, for defendant:

The article was prima facie privileged on the ground of its public character, and because its publication was necessary to protect defendant's reputation, and perhaps secure his re-election. It is difficult, if not impossible, to lay down a rule which shall show when communications, as to persons in a public position, are privileged and when not. Indeed, the question is perpetually running into another, whether criticism of a public official can be called defamatory, and this depends upon the nature of the article and the circumstances of the case: Odgers on Slander and Libel (Bigelow's ed.), p. 35. The case at bar comes far within the rule laid down in *Atkinson v. Free Press*, 46 Mich. 355, and approved in *Maclean v. Scripps*, 52 Mich. 214; also, in *Miner v. P. & T. Co.* 49 Mich. 358; *Wieman v. Mabee*, 45 Mich. 484. Every one has a right to publish all that he has good cause to believe necessary to protect his property or reputation: Townsend on Slander and Libel, § 240 and authorities; Odgers on S. and L. 224–8 and authorities. If the communication is privileged, the burden is on the plaintiff to prove the falsity of the statements, and that defendant published them from some unworthy motive: *Edwards v. Chandler*, 14 Mich. 471; *Wieman v. Mabee*, 45 Mich. 484, and also to show that the article is defamatory. In considering this question, it does not seem to be material to the right of

action, that the statements were published in a newspaper, rather than spoken, so far as the words refer to the plaintiff in her profession as a teacher.   All defamatory words which refer to a person's professional conduct, are actionable, whether spoken or written, and therefore no more or less in one case than in the other.   And words not defamatory cannot be the basis of an action, whether written or spoken: Townsend on Slander and Libel, § 180.   I find no case where words like those in question have been held libelous, and there are many cases which imply the contrary: *Mayrant v. Richardson*, 1 Nott. & McCord, 347, 353; *Onslow v. Horne*, 3 Wilson, 187; *Sumner v. Utley*, 7 Conn. 260; *Secor v. Harris*, 18 Barb. 427; *Tobias v. Harland*, 4 Wend. 537; *Evans v. Harlow*, 5 A. & E. (N. S.) 624; and only a charge of gross ignorance in a professional man is actionable: Townsend on Libel and Slander, § 194; *Spiering v. Andräe*, 45 Wis. 330, and cases cited; *Gauvreau v. Superior Pub. Co.* 62 Wis. 403.   In *Sweeney v. Baker*, 13 W. Va. 138, the distinction between words of general depreciation, which are mere matters of opinion, and distinct charges as to one's moral character, is pointed out, and the former held not libelous.

CAMPBELL, C. J.   Plaintiff sued defendant for libel.   The superior court of Detroit held the article sued on to be of such a nature that its publication was not actionable under the circumstances and occasion.

There is some question whether the remedy in this Court has not been cut off by delay in bringing the case into shape for review; but as counsel have desired us to disregard this difficulty, and it is not so apparent on the record as necessarily to oust our jurisdiction, we shall dispose of the case on the issues.

The publication appears to have come about in this way. Plaintiff had been employed for a year, under an annual appointment, to give lessons in the art of drawing to teachers in the public schools of Detroit, to enable them to teach their own pupils.   At the end of the year the defendant, who is superintendent of schools, did not recommend her for reappointment.   Some controversy appears to have arisen in the board of education which became public, and the defendant's course was sustained.

Thereupon, a reporter of the Detroit *Post and Tribune* called upon Gen. Trowbridge, who was understood to be a friend of plaintiff, and by the process familiarly known as "interviewing," obtained what purported, as published, to be a full account of the supposed difficulties which led to defendant's action. In this article Gen. Trowbridge, who was a member of the board of education, was represented as stating, in a narrative form, that the difficulty was in the disposition of one man, the defendant, to control, not only the teachers, but the board of education itself, and that the teachers were in abject fear of him, and dare not be seen talking with a member of the board. After some other statements, the narrative proceeded to state that defendant was opposed to plaintiff, and it seemed to be a question which of the two should go ; that the trouble originated in a very trivial way ; that Miss O'Connor having been employed, the teachers did not at first take kindly to the idea of having the additional duty of teaching drawing, and Gen. Trowbridge and Prof. Hailmann, another member of the board, both being new members, called a meeting of teachers, where he introduced plaintiff with a few remarks, and she also made a few remarks, expressing a hope that their relations would be pleasant. It was then stated that Gen. Trowbridge soon heard that defendant had said that he and Prof. Hailmann had better get a brass band to play every time a new teacher was employed, and that defendant had since been hostile to plaintiff. It then accused him of making contradictory statements about his opposition to her ; and intimated that if the matter of defendant's own reappointment had come up in the board, the narrator would have made to them the same statement, and, while possibly not opposing his confirmation, would have asked time to have him explain.

On the same day when the *Post and Tribune* published this account, a reporter of that paper visited defendant, and drew from him the statement which is complained of as libelous, and which refers at length to Gen. Trowbridge's narrative, and gives defendant's answers and explanations.

This article was shown to defendant, and allowed by him to be published as it was printed. No question was therefore made as to his responsibility if libelous. The declaration counts only upon certain parts of the article containing defendant's objections to, and strictures upon plaintiff, drawn out by questions put to him by the reporter. These are claimed to have been actionable.

The matters complained of may be summarized as follows. Defendant freely admitted that she was industrious and diligent in discharging her duties, but his sincere belief, in which he thought his opinion indorsed by the most intelligent teachers, was that she had practically misapprehended the plan of the board, which was to give the teachers a thorough course in drawing; that her instruction had been rather as to details than principles, and while they had acquired a considerable degree of skill of hand and accuracy of eye that would be useful in their work, she had failed to give them what, as teachers, they most needed, namely, the power to see the relations of the parts to the whole, the line of thought which drawing includes, and the sequence of the topic which they had studied; that her work was fragmentary and disjointed, and on the whole she was not a successful teacher of drawing; that he had seen also many evidences of an infirmity of temper, and vacillating disposition, unfitting her for large usefulness as an educator. In answer to further questions as to illustrations of these matters, he said he had found her irascible, petulant, and contradictory; and he then referred to an interview in which, in a peremptory way, she asked for a paper, and before he could hand it to her seized it in an angry and violent manner. On this occasion, in view of the many misunderstandings which their conversations had resulted in, he declined to discuss any matter of importance, except in the presence of witnesses, and had adhered to it, and that in view of these misunderstandings, he deemed it unsafe to communicate with her without such precautions as were before referred to.

It was not disputed that if these remarks had stood alone, and had been published without occasion, they might have

appeared to come within the scope of the law which treats as libels such publications as are designed and tend to expose the persons described, to hatred, contempt, or ridicule. This, however, could only be where from a fair reading, and from the absence of any reason for publishing them at all, an evil design, or an inference of want of care for ill consequences, might naturally be assumed. Private persons cannot be lawfully made the subject of ill-natured remarks in the public press, where they have done nothing to expose themselves to public censure ; and where such things are published as have an injurious tendency, the persons giving them publicity must find some justification, or be responsible for the mischief.

But we agree with the judge who tried the cause, that this article was not libelous as against plaintiff, and that when naturally and fairly construed it was privileged by the occasion.

Falsehood in fact, which is derogatory, is not privileged in such an article. But there is nothing in it which contains any charge of wrong or misconduct. The only thing which counsel suggested as having such a bearing, was the reference to misunderstandings and to contradictory habits. But, as was properly held below, the article will not bear the construction that any insinuation of want of veracity was conveyed. The whole contest shows that complaint was confined to a want of harmony, and a difficulty of getting at a common understanding, which is of every day occurrence between people who are prejudiced against each other, or who are jealous of their personal independence. In our opinion, all that is set out in the declaration amounts to nothing more than criticism, most of which is purely professional, and none of which is intrinsically offensive beyond what may result from a failure to accord with defendant's views of plaintiff's disposition and methods of teaching.

The article, in order to try its libelous quality, must all be read together. Parts of it cannot be severed from the rest, so as to give them a meaning which the whole would not justify ; and the spirit of the whole article must be deter-

mined largely from the occasion which led to it.   Very little of it was confined to the plaintiff.

It appears, then, that the article was not prepared as a volunteer publication without provocation or occasion, but was drawn out by the inquiries of another person, and in view of a previous publication made the same day, purporting to emanate from a prominent member of the board of education, and holding defendant up to public censure for misconduct and unfitness for an important public office at the head of the city school system.   Plaintiff's name had been used in this article, which made very serious charges against defendant of injustice to her and of tyranny to others.   The article was directly calculated to injure defendant's standing as a school officer, as well as in other respects.   It was well adapted to create distrust and prejudice in regard to the school work, which depended on defendant's qualifications as superintendent.

Defendant was called upon by the respectability of its source, and the seriousness of the animadversions upon him, to vindicate himself and explain his conduct, and this controversy concerned, not only himself, but the public interests. It was in no sense a mere discussion of plaintiff's merits ; it was defendant's conduct which was involved. He had a right, therefore, to come before the public and meet the attack upon him, and he could not be made responsible for libel in doing so, unless he made serious false charges of fact, or wanton and irrelevant assaults on plaintiff's character.   As already suggested, there are no charges made of wrong doing whatever.   Neither were there any such comments as exceeded the bounds of legitimate criticism, which, as pointed out in *Bronson v. Bruce*, 59 Mich., 467 may sometimes be harsh and unjust, but is not unlawful, if called out by the occasion which justifies printing it.

Defendant could not have met the attack made upon him without speaking of plaintiff, and of his relations with her, and her conduct as a teacher.   In doing this he expressed himself not unkindly as to her artistic merits and her skill as an artist.   The criticisms made upon her as a teacher related

to her overdevotion to details at what he deemed to be the expense of certain generalizing ideas and methods, which he considered material in her field of instruction ; and he also referred to an impatience of temper and vacillating disposition, which seemed to him to interfere with extended usefulness.

There was nothing in this latter criticism which might not be, and is not frequently, said of persons of both sexes by their friends and admirers. No one is ever disgraced or despised for any such estimate ; and while all such estimates depend almost entirely on the supposed knowledge of character and lack of prejudice of the person who makes them, no one ever thinks of regarding them as serious wrongs, unless made with malice and without occasion for speaking. The occasion, and an apparent necessity, existed here to refer to plaintiff, and the criticism, whether just or unjust, was privileged by it.

The criticism of plaintiff's teaching methods was not only on its face the expression of an opinion, but it furnished some means of determining among artists and teachers the measure of its own sufficiency. It vindicated plaintiff as an artist, and to a large extent as a teacher, and it found fault with her teaching on grounds upon which artists always have been and always will be divided. The large class of critics who admire precision and minuteness of detail would derive no prejudice from censures which, in their eyes, would be praises; and no one, whatever might be his preferences for what might be deemed broader treatment, could fail to see that accuracy is no small merit. If such criticisms are libelous, there would be very little room for criticism at all ; and while it may be possible to do much wrong in uncalled for and malicious strictures, published without cause or reason, and while they may, under some circumstances, be actionable, they can never be so when made upon sufficient occasion, and published when publication is pertinent to that occasion.

In *People v. Jerome*, 1 Mich. 142, the unnecessary publication of what was evidently meant to be a depreciatory

notice of a tradesman, who, as was charged, would not sub-
scribe for watering the street in front of his place of busi-
ness, was held not libelous.   In that case there was no proper
reason for such a publication, and it was meant to be offensive;
but the court held it would not do to hold every ill-natured
remark worthy of legal notice.

In the present case no malicious purpose could be drawn
from any of the language used, and whatever regret must be
felt at the public criticism of a person whose worthiness is
not impeached, and who did not herself intrude her griev-
ances upon the public, it was not unjustifiable in defendant
to defend himself, and in doing so he cannot be made liable
for his opinions which impute no wrong.

The judgment must be affirmed.

SHERWOOD and CHAMPLIN, JJ., concurred.

MORSE, J., dissenting.   I am unable to agree with the
views of the chief justice in this case.

The article published in the *Post and Tribune* was care-
fully supervised by the defendant before it was allowed to
go to press, and no doubt but some pains were taken to avoid
any responsibility for damages in an action for libel.

A portion of the article came within the principle of
privilege, the defendant being superintendent of the schools
and the plaintiff being teacher, as it can be considered only
as a criticism of her ability and usefulness as a teacher, of
which, by his position, he had a right to speak.

But when he went outside of this, and allowed himself to
be interviewed as to the personal relations between himself
and the plaintiff, he stepped out of the pale of legitimate
criticism, and must be responsible for his words, if false.

After describing an interview between them, in which he
stated that she seized a paper, or snatched it from a book, in
an angry and violent manner, he says:

" On this occasion, in view of the many misunderstandings
which our conversations had resulted in, I declined to dis-
cuss any matter of importance except in the presence of

witnesses, to which decision I have adhered. In view of these misunderstandings, I deemed it unsafe to hold conversations with her without such precautions as I have stated."

The innuendo in plaintiff's declaration avers that he meant by this language to impute and charge that the plaintiff was ill tempered, rude, uncultivated, and passionate, and an untruthful person; and that she was an unsafe and dangerous person with whom to hold communications or conversations; and that it was necessary for his self-protection that conversations were only had with her in safety in the presence of witnesses.

I think the language used bears out the innuendo, and that ninety-nine persons out of one hundred would naturally interpret such language as implying that the plaintiff was so untruthful that it was not safe to have any important conversation with her alone, as she might pervert it. It was most libelous, and there is no privilege known to the law that will shelter or excuse the defendant in the use of it, if not true.

The evidence also of the plaintiff and defendant, taken together, show conclusively to my mind that defendant was actuated by actual malice. There was no excuse for this part of the publication, and the fact that it was not merely loose talk in the heat of excitement, exaggerated by the reporter, but the studied and scholarly words, written and revised after writing in cool blood, of the defendant, for no good purpose, but adds to the meanness and malice of the article.

The defendant had made his antipathy against the plaintiff felt at the school board, where it was perhaps proper that he should act. She had lost her situation through him. Then, upon the pretense of defending himself, or, as his counsel claims, to further his own reappointment or election as superintendent, not satisfied with criticising her as a teacher, he unnecessarily and wantonly attacks her character for truth and veracity; and does this through the public press, copies of which publication he helps to circulate. The consequences are that the plaintiff can get no employment anywhere. If

what he published is untrue, he has done her a most wanton
and grievous wrong, for which the courts of law ought to
give her as much redress as they can.

Yet, under the ruling of the court below, she is not allowed
to prove the falsity of this charge before a jury ; and the
doctrine, abhorrent to every sense of justice, is established
that a cool and calculating superior can ruin with his untruth
his inferior teacher, because it is his privilege.  It is not
necessary to cite authorities.  If he had said in a frank,.
impulsive, blunt way that she was a liar, the court would not
have hesitated a moment in allowing her ample opportunity
to prove the statement false, and in affording her such poor
reparation as the law could give her, if it were proven to be
untrue.  But, forsooth, because it has been polished and
revised, and published in more obscure but yet invidious
phrase, the meaning of which, however, is plainly apparent
to the common understanding of men, courts are to haggle
over it, and deny this girl justice.  All the learning and
sophistry of our profession cannot convince the plain com-
mon sense of the average reader, that the defendant, in the
use of the word " misunderstanding," meant only that the
plaintiff was only deficient in her hearing, or in her under-
standing of what took place in the conversations between
her and the defendant.  On the contrary, the impression is
irresistible that what defendant did mean was that the plaint-
iff would go away from their talks and intentionally misrep-
resent what took place between them, and this because of her
natural temper and disposition.

It is difficult to understand why this matter of their per-
sonal behavior towards one another, or the talks they had,
was of any public concern; or why it was necessary for the
defendant to publish it, even in his own defense, or for his
own advantage in the coming election of superintendent,
unless he was conscious that he had not treated her as he
ought.

It is evident to my mind from the testimony that from
the moment Gen. Trowbridge and another member of the
school board called the teachers together, and introduced

Miss O'Connor to them, the defendant was displeased, and thereafter refused to treat her with the common civility that a gentleman ordinarily pays to a lady, or with the courtesy that his position as her superior demanded. The plaintiff testifies that "Prof. Sill, during the whole time I taught there, was very unkind to me. Whenever I would ask him a question in particular, he would never give me a polite answer." His own testimony and his actions corroborate her testimony. When there is evidence that he said to her: "I don't intend to give you any assistance, help, or support of any kind, and there is no use of your coming to me for it; you may just go along the best way you can,"—it smacks to me of malice.

The case should have been submitted to the jury, the interview itself, as revised by the defendant, being in the respect I have indicated outside and beyond any just privilege, and the evidence having the strongest tendency to show that the publication was made with actual malice, for the existence of which there does not seem to be, in the record, any adequate excuse or provocation.

A motion for a rehearing was denied May 13, 1886. Morse, J., dissenting.