ADDIE CHERRY, Appellant, v. THE DES MOINES LEADER, STRAUSS & DAWSON, SAMUEL STRAUSS AND ALLAN DAWSON, Appellees.

**Libel: PRIVILEGE:** *Criticism of public performance.* Plaintiff and her sisters were giving public entertainments as singers, dancers, reciters, and comedians, singing songs and reciting productions composed by themselves. They were persons without musical or dramatic ability, and their performance was childish and ridiculous, causing great disorder and confusion. Defendants published in their newspaper a severe and satirical criticism, holding the performers up to ridicule. *Held,* in an action for libel, that it was proper to direct a verdict for defendants, there being no proof of actual malice, since, as the

article was concerning a public performance, it was qualifiedly
privileged, even though written in ridicule and sarcasm and
exaggerated.

PLEADING PRIVILEGE.   Where, in an action for libel, defendants an-
swered that plaintiff was engaged in giving public performances
as a singer, dancer, reciter, and comedian, and her performances
were coarse, and farcical, wholly without merit and ridiculous,
and the alleged libel appeared in their papers as a criticism of the
performance and to expose the character of the performance,
written in a facetious and satirical style, such plea was one of
privilege.   .

Practice:  DIRECTING VERDICT.   A motion to direct a verdict should
be granted where it clearly appears to the trial judge that it
would be his duty to set aside a verdict in favor of the party
on whom the burden of proof rests.

*Appeal from Polk District Court.*—HON. C. A. BISHOP,·
Judge.

TUESDAY, MAY 28, 1901.

ACTION for libel.   Trial to a jury, directed verdict for
defendants, and plaintiff appeals.—*Affirmed.*

*W. B. Crosby* and *Spurrier & Maxwell* for appellant.

*James C. Hume* for appellees.

DEEMER, J.—The action is predicated on the publica-
tion of the following article:  "Billy Hamilton, of the Ode-
bolt Chronicle, gives the Cherry Sisters the following graphic
write-up of their late appearance in his town:  'Effie
is an old jade of 50 summers, Jessie a frisky filly of
40, and Addie, the flower of the family, a capering
monstrosity of 35.   Their long skinny arms, equipped with
talons at the extremities, swung mechanically, and anon
waived frantically at the suffering audience.   The mouths
of their rancid features opened like caverns, and sounds like·
the wailings of damned souls issued therefrom.  They pranced
around the stage with a motion that suggested a cross between·
the *danse du ventre* and fox trot,—strange creatures with

painted faces and hideous mien. Effie is spavined, Addie is stringhalt, and Jessie, the only one who showed her stockings, has legs with calves as classic in their outlines as the curves of a broom handle.'" The defendants pleaded that plaintiff, with her sisters, were engaged in giving public performances, holding themselves out to the public as singers, dancers, reciters, and comedians; that their performances were coarse and farcical, wholly without merit, and ridiculous; that the Des Moines Leader is a newspaper published in the city of Des Moines, which the other defendants were conducting, and that the article appeared as a criticism of the performance given by plaintiff, and to expose the character of the entertainment; that it was written in a facetious and satirical style, and without malice or ill will toward plaintiff or her sisters. This is clearly a plea of privilege, and the direction to the jury to return a verdict for defendants was, no doubt, on the theory that the plea of privilege was established. That it was published of and concerning plaintiff in her role as a public performer scarcely admits of a doubt, and it is well settled that the editor of a newspaper has the right to freely criticise any and every kind of public performance, provided that in so doing he is not actuated by malice. In other words, the article was qualifiedly privileged. *Gott v. Pulsifer,* 122 Mass. 238 (23 Am. Rep 322); *Fry Bennet,* 28 N. Y. 324; *Shurtleff v. Stevens,* 51 Vt. 501 (31 Am. Rep. 698); *Dooling v. Publishing Co.,* 144 Mass. 258 (10 N. E. Rep. 809). The occasion was such that the presumption of malice arising from the publication is rebutted, and plaintiff, in order to recover, must prove actual malice. *Nichols v. Eaton,* 110 Iowa, 509. By the term "actual malice" is meant personal spite or ill will, or culpable recklessness or negligence. Such malice may be shown by extrinsic evidence, or it may be gathered from the publication itself. *Nichols v. Eaton, supra.* There is absolutely no evidence, outside the publication itself, tend-

ing in any manner to show malice; hence, if malice be found, it must be from the article published. Ordinarily publication of such an article as the one in question would be of itself an *indicia* of malice, but as applied to the facts of this case, we do not think it should be so held. Plaintiff described the entertainment she and her sisters gave, in part, as follows: "These entertainments are concerts,—literary entertainments. I don't sing much. The others do. I have recitations and readings; recite and read in costume. In feminine costumes. Dresses as long as I have on, or shorter. I don't wear short dresses. Sometimes I have worn men's clothes. I never dance. I recite essays and events that have happened, I have written up some of my own. I have none of them with me. One is, 'The Modern Young Man;' the other, 'An Event that Happened in the City of Chicago.' I sing an Irish song,—an Irish ballad; also a eulogy on ourselves. It is a kind of a ballad composed by ourselves. I help the others sing it. I have forgotten it. It is about an editor. In the chorus I walked a little around the stage,—kind of a fast walk. A cavalier is a Spaniard, I believe. I represent a Spaniard. That is given in the act that we call 'The Gipsy's warning.' I wear my bicycle bloomer rig. They reach to my knees, and are divided like leggings,—black leggings with buttons on them. I wear a blue blouse,—a blue velvet blouse. Sometimes red and sometimes green. I have many suits; wear them in turn. The leggings are always black. In the chorus I walked a little around the stage,— kind of fast walk or a little run. Had on different kind of clothes,—mostly silk. We had a reproduction of the performance called 'Trilby.' The singing of Ben Bolt by my little sister. I would come in and hypnotize her in a farce way. I would tell the audience that I would hypnotize her while she would sing. I didn't appear at any show without stockings. My little sister was barefooted in one act,—in very long dresses to her ankles. She also appears in a long robe in a tableau clinging to the cross. 'Cherries ripe and

cherries red' is a eulogy song. I was not asked to repeat only
one verse. Q. What is the verse? A. 'Cherries red and
cherries ripe, the cherries they are out of sight, cherries ripe
and cherries red, Cherry Sisters still ahead.' " The defend-
ants' evidence regarding the character of the performance is
in part as follows: "It was the most ridiculous performance
I ever saw. There was no orchestra there. The pianist left
after the thing was half over. She could not stand the racket
and left. There was no other music, except vocal music from
the Cherrys. They had a drum, and I think they had cym-
bals. As near as I can recollect, the curtain raised at the
beginning, and the Cherrys appeared and gave a walk around
and a song. I think it was 'Ta, ra, ra, Boom de-ay.' They
read essays and sung choruses and gave recitations, inter-
spersed with the remarks that, if the boys didn't stop, the
curtain would go down. One young man brought a pair of
beer bottles which he used as a pair of glasses. They threat-
ened to stop the performance unless he was put out, but he
was not put out, and they didn't stop. When the curtain
went up and the audience shrieked and indulged in catcalls,
and from that time one could hardly hear very much, to
know what was going on, to give a recital of it. There was
no bad language used, however. When Jessie was on the
stage she appeared in the Trilby act in bare feet and short
dresses. She was asked to trim her toe nails, and such ir-
reverent remarks as that. She appeared more pleased than
anything else. They had a washtub scene. I think Effie and
Addie appeared with bare arm showing to the elbows, which
were quite prominent. They went through the motions of
washing, singing at the time. There was another piece called
'The Gipsy's Warning.' One of the sisters appeared in a
male costume. Then there was a song, 'I want to be an edi-
tor,' and an explanation, accompanying the song, that an
editor down at Cedar Rapids insulted them, and they made
him pay dearly for it. The song was too jumbled up one
could hardly make anything out of it, except, 'I want to be-

an editor, I want to be an editor,' whereupon the audience rose as one man and called on me to stand up. I did not stand up. My wife was there. While Jessie sang this she was rolling her eyes and swaying her body. I am not qualified to pass an opinion upon the merits of the singing. The discord was something that grated on one's nerves. There was short stepping around and swaying of the body. They went around the stage in one of their pieces,—I cannot say which,—sort of a mincing gait, shaking their bodies and making little steps. That is what made me describe it as a cross between the *danse du ventre* and a fox trot. They had their hands in front of them and at their sides. There was a tableau at the close, as I recollect. Jessie was the central figure in that piece, with her eyes uplifted, red lights, and so on. There was a 'Rock of Ages.' The audience was talking to the women, and they (the Cherry Sisters) would talk back. They would say: 'You don't know anything. You have not been raised well, or you would not interrupt a nice, respectable show.' Nobody left during the performance except the pianist." In the light of this evidence, and some other that cannot be reproduced, the trial court directed a verdict for the defendants. We are now asked to set aside its order on the theory that the question of malice was for the jury. This is, no doubt, the correct rule, when there is substantial evidence of actual malice, either in the publication itself, or in the facts and circumstances surrounding the transaction. A mere scintilla is not sufficient, however, to take the case to the jury. The evidence should raise a probability of malice, and be more consistent with its existence than its absence. When the occasion is privileged the presumption arises that the publication was bona fide and without malice, and it is incumbent on plaintiff to overcome this presumption. If, from defendant's point of view, strong words seemed to be justified, he is not to be held liable, unless the court can say that what he published was to some extent, at least, inconsistent with the theory of good faith.

These rules are well settled, and need no citation of authorities in their support. One who goes upon the stage to exhibit himself to the public, or who gives any kind of a performance to which the public is invited, may be freely criticised. He may be held up to ridicule, and entire freedom of expression is guarantied dramatic critics, provided they are not actuated by malice or evil purpose in what they write. Fitting strictures, sarcasm, or ridicule, even, may be used, if based on facts, without liability, in the absence of malice or wicked purpose. The comments, however, must be based on truth, or on what in good faith and upon probable cause is believed to be true, and the matter must be pertinent to the conduct that is made the subject of criticism. Freedom of discussion is guarantied by our fundamental law and a long line of judicial decisions. As said in the *Gott Case, supra* the editor of a newspaper has the right, if not the duty, of publishing, for the information of the public, fair and reasonable comments, however severe in terms, upon anything which is made by its owner a subject of public exhibition, as upon any other matter of public interest; and such a publication falls within the class of privileged communications, for which no action will lie without proof of actual malice. See, also, *Eastwood v. Holmes,* 1 Fost. & F. 347; *Paris v. Levy,* 9 C. B. (N. S.) 342; *Donaghue v. Gaffy,* 53 Conn. 43 *(2 Atl. Rep. 397)*; *Carr v. Hood,* 1 Camp. 355, note. Surely, if one makes himself ridiculous in his public performances, he may be ridiculed by those whose duty or right it is to inform the public regarding the character of the performance. *Cooper v. Stone,* 24 Wend. 434. Mere exaggeration, or even gross exaggeration, does not of itself make the comment unfair. It has been held no lible for one newspaper to say of another, "The most vulgar, ignorant, and scurrilous journal ever published in Great Britain." *Heriot v. Stuart,* 1 Esp. 437. A public performance may be discussed with the fullest freedom, and may be subject to hostile criticism and hostile animadversions, provided the writer does not do it

as a means of promulgating slanderous and malicious accusations. *O'Connor v. Sill,* 60 Mich. 175 (27 N. W. Rep. 13) ; *Davis v. Duncan,* L. R. 9 C. P. 396. Ridicule is often the strongest weapon in the hands of a public writer; and, if it be fairly used, the presumption of malice which would otherwise arise is rebutted, and it becomes necessary to introduce evidence of actual malice, or of some indirect motive or wish to gratify private spite. There is a manifest distinction between matters of fact and comment on or criticism of undisputed facts or conduct. Unless this be true, liberty of speech and of the press guarantied by the constitution is nothing more than a name. If there ever was a case justifying ridicule and sarcasm,—aye, even gross exaggeration,— it is the one now before us. According to the record, the performance given by the plaintiff and the company of which she was a member was not only childish, but ridiculous in the extreme. A dramatic critic should be allowed considerable license in such a case. The public should be informed as to the character of the entertainment, and, in the absence of proof of actual malice, the publication should be held privileged. There is another rule of general application, now well known to the profession, that is involved, and that is that a motion to direct a verdict should be sustained when it clearly appears to the trial judge that it would be his duty to set aside a verdict in favor of the party on whom the burden of proof rests. *Meyer v. Houck,* 85 Iowa, 319.

Viewing the evidence in the light of the rules heretofore announced, and remembering that the trial court had the plaintiff before it and saw her repeat some of the performances given by her on the stage, we are of opinion that there was no error in directing a verdict for the defendants.—AFFIRMED.