JOHN BLOSSI, Appellant, v. CHICAGO & NORTHWESTERN RAILWAY COMPANY, Appellee.

**Railroads:** CROSSING ACCIDENT: SETTLEMENT AND RELEASE: EVIDENCE. One in the full possession of his mental faculties is competent to settle and release all liability for personal injuries received, and where there is no attempt to mislead but every effort is made to fully explain matters to him and he apparently comprehends and agrees to all that is said and done, a settlement so made is valid and enforceable; and it is no objection that the same was accomplished through an interpreter because of his inability to speak the English language, where such interpreter used every effort to fully acquaint him with all the facts, and it is apparent he understood and comprehended the transaction. In the instant case the evidence is reviewed and held to support the validity of a settlement made through an interpreter with a railway company, for injuries received by collision at a railway crossing, and that the same was a bar to a subsequent action for damages.

**Trial:** DIRECTION OF VERDICT. Where it would have been the duty of the court to grant a new trial if the jury had found for plaintiff on a certain issue, a directed verdict for defendant on that issue was proper.

**Physician and patient:** CONFIDENTIAL COMMUNICATIONS. A physician is only forbidden to testify, in an action to which his patient is a party, concerning information of a professional character communicated to him by reason of his employment and necessary and proper to enable him to discharge his duties.

**Same:** MINISTER AND PARISHIONER. The communications of a parishioner to his minister, acting simply as a friend and interpreter and having no relation to spiritual matters, are not privileged.

**Evidence:** STATE OF MIND: PREJUDICE. One seeking to avoid a release of a claim for damages on the ground that it was obtained by fraud, may state whether he understood the paper signed was in settlement of his claim; but any error in excluding the testimony was without prejudice, where the party was afterward permitted to give his understanding of the matter inquired about in detail.

**Same.** An agent procuring a settlement of a claim for injury may state that he understood that the claimant at the time knew the nature of the transaction; as the same had a material bearing on the issue of fraud in procuring the settlement, and could be reached in no other way.

*Appeal from Hardin District Court.*—HON. C. G. LEE, Judge.

TUESDAY, NOVEMBER 23, 1909.

ACTION at law to recover damages for injuries received by plaintiff in a collision with one of defendant's trains at a street crossing in the town of Eldora, due, as is alleged, to defendant's negligence. Defendant denied any negligence, pleaded plaintiff's contributory negligence, and a full and complete settlement with him of all claims for damages. There was a trial to a jury, and at the conclusion of the testimony the court, on defendant's motion, directed a verdict for defendant, and plaintiff appeals. *Affirmed.*

*Ward & Williams, J. H. Scales* and *A. J. Scales,* for appellant.

*J. C. Davis, George E. Hise, E. H. Lundy* and *A. A. McLaughlin,* for appellee.

DEEMER, J.—The negligence charged against the defendant is as follows:

That at said time, without giving any signals required to be given by trains approaching highway crossings, the defendant recklessly, wantonly, and negligently, at a high and dangerous rate of speed, ran an engine and cars upon and over said street crossing while plaintiff was driving his team thereon, and in such a wanton and negligent manner as to not allow plaintiff to pass over said crossing in safety, but ran said train upon and against plaintiff's said team and against plaintiff, who was at the time riding in

the vehicle drawn by said team which he was then and there driving. That the approach of said train in running upon said crossing was concealed from plaintiff by rises in the ground and a building until his team had reached a point where he could not retreat and avoid the impending collision. That said train was run with the engine in the rear of a coach which was being pushed ahead of said engine at a high and reckless speed of about thirty miles an hour without waining or signals, as heretofore mentioned and set forth. That while plaintiff was approaching and on said crossing, under the circumstances aforesaid, the defendant's train operators saw, and could have fully seen, said plaintiff's peril and danger in being exposed to the collision with said train upon said crossing, and could have stopped or slacked the speed of said train being operated as aforesaid, but they negligently and wantonly failed to apply brakes or otherwise use means or appliances to avert the collision which was there obvious to said operators or men in charge of the running of said train.

There was enough testimony to take the case to the jury upon some or all of these specifications, and we do not understand that the verdict was directed because of absence of proof of negligence. The ruling was grounded upon two propositions: First, that plaintiff was as a matter of law guilty of contributory negligence under the undisputed facts; and, second, that the testimony showed beyond all reasonable dispute a settlement of all of plaintiff's claims. Some rulings on the admission and rejection of testimony are complained of, which so far as material will be considered during the course of the opinion.

Plaintiff received his injuries September 29, 1906, and he was immediately taken to the hospital of a Dr. Morse, in the town of Eldora, where he remained until the latter part of November of the same year. One of defendant's claim agents called upon him a few days after the accident to get his statement as to how the accident occurred. This agent, whose name was Pitt, made no attempt

1. RAILROADS: crossing accident: settlement and release: evidence.

to settle the matter at this time; but on October 10, 1906, he came back to Eldora, and through Rev. Guenther and one Tresemer, friends and acquaintances of the injured man, who acted as interpreters and advisers, he negotiated a settlement with plaintiff for his injuries, paying him the sum of $75 by draft, and agreeing to pay his, plaintiff's, expenses at the hospital, including surgeons, doctors, nurses, and hospital bills. A full and complete release was at this time signed by the plaintiff, reciting the above payment and agreement as the consideration for the settlement. Pursuant to promise, defendant paid, in addition to the $75, $128, representing doctor bills, hospital expenses, etc. Plaintiff claims that this settlement was procured by fraud, misrepresentation, and deceit, and while he was suffering great pain and only partially conscious. He has, however, retained the entire consideration paid, and now seeks to avoid the settlement for the reasons above given. Plaintiff did not understand the English language, and Pitt, the agent, could not converse with him save through an interpreter. Rev Guenther and Mr. Tresemer, plaintiff's friends, acted as such interpreters. No testimony was offered to sustain the claim that plaintiff was suffering severe pain, or that he was not in the full possession of his mental faculties. Plaintiff's testimony, so far as material regarding this settlement, was as follows:

When I was in the hospital some one tried to get me to sign a paper for the railroad company. There were no papers presented to me that I could read. At the time the paper was presented to me I was in bed in the hospital in Eldora. . . . Q. Did you understand that any papers signed by you that day were in settlement of the injury you received in the collision? (Objected to by the defendant as calling for the conclusion of the witness, and improper and leading. He should be required to say what was said and done and who said or did it. Objection sustained and plaintiff excepts.) . . . Witness: I don't know who the party was who presented the papers to me.

I did not understand what he said.    Q.    When it was presented to you, did you understand what the paper was? (Objected to by defendant for the same reasons as above urged.    Objection sustained and plaintiff excepts.)  . . . Q. Did you understand what the parties said when they presented the paper to you?    (Objected to by defendant for the same reasons as above urged.    Objection overruled and defendant excepts.)    Witness:    No.  . . .    Witness:    There were three of them.    Tresemer and the preacher, and I don't know who the other was, who presented the paper to me.    I did not understand it.    (The defendant moves to strike the answer as not responsive and a conclusion and incompetent.    Motion sustained and plaintiff excepts.)    Witness:    I did not understand what it meant.    (The defendant moves to strike the answer for the same reason.    Motion sustained and plaintiff excepts.)    Q. I am not asking you whether you understand the agreement, but what you understood those people said to you about the agreement?    A. He understood that he should write his name.    (The defendant moves that the answer be stricken as not responsive and a conclusion, and incompetent.    Motion sustained and plaintiff excepts.)    Witness:    I understood that they were going to give me $75 to heal my leg.    The Court:    If you understood those parties that presented the paper to you said that, it will stand; but you don't say that.    Q. Tell what you understood these parties that presented the paper said it was for?    The Court: I think it proper for him to state what his understanding was of what they said.    He can give us what he understood them to say.    If your questions get at that as to him giving his understanding of what they said, it will stand.    (Defendant excepts.)    Witness:    The preacher told me to write my name.    I understood that they were to give me $75 to heal my leg as near as I could understand it.    I understood that they said that this money was to be paid to Dr. Morse.    Neither my wife nor my daughter nor any member of my family was present when they talked with me.    I don't remember when I first understood what the writing that I signed meant.    It was never read to me so that I understood it.    I knew that one of the parties there was a preacher.

On cross-examination the witness testified with reference to the matter as follows:

I don't remember signing a paper in Dr. Morse's office. I remember the preacher and Mr. Tresemer and another man there. I had known the preacher ten years and attended his church occasionally. I don't know how long they were there that day. Dr. Morse was there part of the time. It was about eight o'clock in the evening. While they were there I signed a paper. The preacher did the talking to me. I signed Exhibit One. I wrote my name when I was in bed. I understand what a person is saying by the motion of the lips, but I do not hear what they are saying to me. Mr. Guenther told me that I would get $75 to cure my leg. The banker came and got the paper that was given me, and the nurse brought me the $75. The nurse brought the money to me the next morning, and a man came from the bank and I gave him the $75. I afterwards got the money out of the bank and used it. I bought some clothes with it. I did not understand that the railway company would pay my hospital bill. Mr. Guenther did not read the paper [Exhibit One] over to me, and I didn't know what the $75 was for, and didn't know the money came from the railway company, and I don't know I got the money because I signed the paper [Exhibit One]. Mr. Guenther told me I should sign my name to that paper and I would get $75. He also said that was to heal my leg. I do not remember any more that Mr. Guenther said to me, and I do not remember all that he said to me. I did not understand all that Mr. Guenther said to me. I understood he said I should sign the paper, but understood no more. I also understood that the money was to heal my leg.

The testimony for the defendant upon this subject: Pitt, the claim agent, testified as follows:

I came back to Eldora on October 10, and saw Mr. Blossi at the hospital. I had no conversation with him. A minister by the name of Guenther, Albert Tresemer, and Dr. Morse were present, and the nurse was in and out of the room. The minister communicated back and forth

between Mr. Blossi and myself. The other gentleman also talked with Mr. Blossi. A paper was prepared at the time and signed by Mr. Blossi and witnessed by the two parties I have referred to. I could not understand the conversation between Mr. Guenther and Mr. Blossi, nor between Mr. Tresemer and Mr. Blossi. We were there to take up the matter of settlement of the claim of Mr. Blossi against the railway company. Mr. Tresemer and Mr. Guenther were there by my request. I did not know these gentlemen before, and had never seen or heard of them. I inquired who could be obtained to communicate with Mr. Blossi—some reputable or responsible person—and Dr. Morse procured these men to come for that purpose. I was introduced by the doctor to these gentlemen. I asked them to communicate with Mr. Blossi with regard to arriving at a basis for settling his claim for injuries he received at the crossing in Eldora on September 29, 1906. After I had stated to Mr. Guenther and Mr. Tresemer what I wanted, they communicated with Mr. Blossi in the German language, and he communicated with them. We were there with him probably a half hour or more. After Mr. Guenther and Mr. Tresemer had communicated with Mr. Blossi on that occasion a paper purporting to be a release in settlement was executed. Exhibit One is that paper. I saw John Blossi attach his name to it on that occasion. At that time Mr. Guenther, Mr. Tresemer, and Dr. Morse were present. Mr. Guenther read Exhibit One over in my presence to Mr. Blossi, and explained the contents of it to him in language that I could not understand. I was right there in the room at the time, and Mr. Blossi was in bed. After it was read over to him I understood that he said that he understood it. I did not understand what Blossi said, but both Mr. Guenther and Mr. Tresemer told me that he said he understood it. At the time Mr. Blossi signed Exhibit One, and the same was delivered to me, I understood that he understood the contents of it, and was agreeing to settle his claim in accordance with the provisions and conditions contained in it, and for the consideration set forth therein. . . . I understood that Mr. Guenther was Mr. Blossi's pastor. I did not select Mr. Guenther, and did not know the gentleman. Dr. Morse recommended him and sent for him. Mr. Guenther and

Mr. Tresemer were not representing the company, and they did not have any authority to make any settlement with Mr. Blossi. I was acting for the company. They didn't make any settlement with him. The settlement was made by me. The only way I knew that he assented to the settlement was what they told me, but I was satisfied in my own mind that he did assent to it. I asked them to ask him if he understood the contents of that release, and he would nod his head. I couldn't understand the language they used in asking him if he understood. The interpreters were there to communicate with him. One of the objects was to get Exhibit One executed. I had no other business with Mr. Blossi that day, except to make the settlement. Mr. Guenther and Mr. Tresemer simply acted as interpreters for Mr. Blossi as much as for the company. They were disinterested parties. I never saw Mr. Blossi, Mr. Guenther, or Mr. Tresemer afterwards until in this courtroom.

Rev. Guenther, who acted as an interpreter, testified regarding this transaction as follows:

I am a minister of the gospel, and have no other business. I knew Mr. Blossi was sick before I went to talk with him, and understood I was called by Dr. Morse, who was the physician attending Mr. Blossi at the time. I was not the agent of the railway company at that time, and never represented the railway company, and did not go there for that purpose on that occasion. I went there because I was called to explain to Mr. Blossi and translate to him some matters. I went as an interpreter. He attended my church sometimes within the ten or twelve years I knew him. He didn't belong to my church, but I guess he did belong to my denomination. I couldn't say for sure. . . . Mr. Blossi answered the questions or statements I made to him in German. I was there as an interpreter, and interpreted to Mr. Blossi what Mr. Pitt said he was willing to give to settle the case. I explained to Mr. Blossi that the company was willing to give him $75, and pay his doctor bills. I included the hospital bill in the doctor bills. Mr. Blossi stated that he was satisfied with that. Mr. Pitt told me to explain to Mr. Blossi that the company

was willing to give him $75 and pay the doctor's bill and the expenses in the hospital. Q. State whether or not you communicated that statement of Mr. Pitt's to Mr. Blossi. A. I did. Q. And on the first occasion that you so communicated that statement to him what did Mr. Blossi say? A. Mr. Blossi, after I explained to him that the company was willing to give $75, he wanted $150. Q. Did you communicate then to Mr. Pitt the statement Mr. Blossi made that he would like to have $150? A. Yes. Mr. Pitt then repeated his first words. He said he wouldn't give more. In answer to that Mr. Blossi said, 'That is good enough.' . . . I explained the proposition the railway company made to him, and he said he was satisfied with $75. He showed that he understood it by saying that he could buy a new buggy for $50 and have $25 left for his pains. I communicated to Mr. Pitt the statement of Mr. Blossi that he would be satisfied to settle for $75 and the settlement and payment of his doctor and hospital bills. A paper was prepared by Mr. Pitt for Mr. Blossi to sign. I saw Mr. Pitt prepare the paper in the sick-room. Mr. Pitt had a small typewriter. After the paper was prepared, I read and explained it to Mr. Blossi. The paper marked 'Exhibit One' is the paper that I interpreted to Mr. Blossi at that time. After Exhibit One was prepared, Mr. Pitt asked me to read it and interpret it to Mr. Blossi. Q. State whether or not you did read it and interpret it to him? A. I translated this paper here into German. By this paper I mean Exhibit One. Q. To whom did you translate it into German? A. To Mr. Blossi. Q. After you had translated it to him, state what he said as to whether he understood it or not. A. He said he understood it. After that he signed it. I saw him sign his name 'John Blossi' on Exhibit One, and I signed it as a witness. I signed my name to the certificate appearing on the back of Exhibit One, and Mr. Blossi signed Exhibit One. At the time I was there that day, I did not see any difference in him from the times I had seen him and talked to him before. . . . I can not remember that he made any complaint of suffering pain while I was there. While I was there, Albert Tresemer also talked to him about the matter of a settlement. I saw the draft delivered to Mr. Blossi after he had signed the release, Exhibit One.

Mr. Tresemer testified, with reference to this matter, as follows:

I am a German, and talk that language. I know John Blossi. I first met him twenty-three years ago, and have known him ever since. I have talked with him from time to time during that period. I am able to talk with and understand him. I saw him in the hospital at Eldora soon after he met with his injury in September, 1906, and saw him more than once. I saw him and talked with him the third day after he was hurt, and called on him several times after that to talk to him for Dr. Morse, to act as an interpreter. I remember of being there on October 10, 1906, when Mr. Guenther and other persons were there. It was shortly after five o'clock in the afternoon. I came at the request of Dr. Morse, made over the telephone. When I arrived, I found Dr. Morse, Mr. Pitt and Mr. Guenther there. I talked with Mr. Blossi after I had been there a few minutes. Mr. Guenther also talked with him while I was there. I understood what Mr. Guenther said to him. I did not talk exactly the same kind of German to Blossi as Mr. Guenther did. Mr. Guenther talked the high German to him and I talked the low German, the kind that is used around on the street, you might say. It might be called dialect. Mr. Blossi answered the questions that I put to him. Q. Did you see anything about him or observe anything in his conversation during any of the time you saw him in the hospital different than the way he had been or had talked prior to or before his injury? A. No; I couldn't see any difference. On the occasion when Mr. Guenther and Mr. Pitt were there I talked to Mr. Blossi about what the company was going to pay him to settle his claim for the injury he had received. I explained to him that the company stood ready to give him $75 and pay his hospital bill, and he was satisfied. He said that was good. Mr. Guenther and Mr. Pitt were there when I came. I did not do anything there in talking to him other than to act as interpreter between Mr. Blossi and Mr. Pitt. Q. State what, if anything, you said to him about whether he could get anything more from the company for his injury, if he accepted the $75 and the payment of his doctor bills. A. As I remember, I read

the paper over to him and explained to him what was in the paper. I can't remember just exactly today what was in the paper, but, as near as I can remember, what I spoke to him. I did not tell him that, if he accepted this money, he could not get anything else from the company. After he said he was willing to accept $75, a paper was produced and submitted to him to sign. Exhibit One is that paper. I saw John Blossi write his name near the bottom on the first page of that paper. I also saw Mr. C. E. Guenther write his name, and saw Dr. Morse write his name on it, and I myself write my name on it. Those names were written after John Blossi' had signed his name to it. I saw Mr. Guenther write his name on the back, after the words 'This is to certify,' etc. The names were written on the back after John Blossi had signed the paper. Mr. Guenther translated the paper, Exhibit One, to John Blossi, and I did also, and John Blossi said that he understood it, and that it was good. After Exhibit One was signed, I saw Mr. Pitt give Mr. Blossi a check for $75. Exhibit Two is the check I saw given to him. I handed the check myself and looked at it, and know that it was for $75, and I told Mr. Blossi that he could take that over to the bank and get cash money for it. I told him he could get $75 for it, and he took the check and put it in his shirt pocket. Mr. Pitt did not have any talk with Mr. Blossi while I was there. I heard Mr. Pitt talk to Mr. Guenther, and I heard him talk that he wanted to make a settlement. His talk was all in English, and he talked the same thing to me. I understood Mr. Guenther and I were brought there for the same purpose. Mr. Guenther talked to Mr. Blossi first and explained to him what the company was willing to do, and Mr. Blossi answered that was all right, and signed the paper after the paper was drawn. The matter was explained to him before the paper was drawn up. The paper was read over later, but the first talk was to come to the amount. He agreed on the amount, and then the paper was drawn up. Mr. Blossi's language was that it was good, and, after he said that, they drew up the paper. Then Mr. Guenther read the paper over to Mr. Blossi carefully, and Mr. Blossi said, 'All right,' and made no objection to anything whatever. He signed it then and there after I had read it and explained it to him

myself. I understood what Mr. Guenther was saying and what Mr. Blossi was saying, and he told Mr. Guenther that he understood it. I asked him if he understood it. I had a little different language and wanted to make sure that he did understand. He was not lying down when he signed Exhibit One. I think he helped himself up. I am quite sure of it. I knew his leg was broken at that time, and was splinted for the purpose of keeping it in place. The matter was talked over by Guenther with Mr. Blossi before Exhibit One was written by Mr. Pitt, and it was explained and he agreed to it before the paper was written. The paper was drawn up according to Mr. Guenther's explanation after Mr. Guenther had explained it, and before I had explained it. My explanation came after the agreement was made. The certificate was put on the back of Exhibit One to show that we had explained to Blossi what was on the paper. The check was made out right away after Mr. Blossi had signed Exhibit One. I don't think Mr. Guenther explained the check to Mr. Blossi, but I did. Mr. Pitt told us to tell him that he could take the check to the bank and it was good for $75. I had visited Mr. Blossi about seven days before. That was soon after the accident. He wasn't any different one time or another, so far as his mind was concerned. He talked just the same to me as he always did before he was hurt. I saw no difference in the state of his mind when these papers were drawn and when I first saw him after he was hurt. So far as I was able to observe him, he looked and acted just the same as he always did, except that he wasn't up and around, walking. I repeated the same thing to Mr. Blossi that Mr. Guenther did. I heard Mr. Pitt tell Mr. Guenther what to tell Mr. Blossi, and heard what Mr. Blossi said about it, and heard him say to Mr. Guenther that he understood it. He said that before he received the $75. I don't remember of seeing him try to give the check to Mr. Guenther, although I believe he did say something about somebody taking care of it over night, until his wife came in. He said she would come in the next day. He didn't want to take care of it himself, and was willing to trust Mr. Guenther with it. I did not tell him that he could get more than $75. He did not ask for any more than $75 while I was there. . . . I was

there when Mr. Guenther made a statement as to what the
company's agent wanted, and heard Mr. Blossi say that he
understood it.   Exhibit One was drawn up right away
afterwards, and it was signed, but it was first read over to
Mr. Blossi by Mr. Guenther and explained.   That was the
second time Mr. Guenther had explained the transaction to
him, but the first time he had explained the paper.   Mr.
Guenther told him that they put in the paper the same
things they had talked over, and Mr. Guenther read it to
him, and explained it to him in German as he went along.
As I understood it, the amount in the paper was mentioned
as a full settlement, and Mr. Blossi didn't claim anything
more than that.   I was paying attention to what was being
done while I was there.   He only claimed $75 while I was
there, and, when the paper was read to him after being
drawn up, nothing was said about anything more.   I think
I understood Mr. Blossi better than Mr. Guenther did.
I think Mr. Guenther understood him all right, but it was
harder for him than for me.   I understood it all plainly,
and didn't have any trouble.   It took Mr. Guenther a little
longer to understand him; and suppose it took Mr. Blossi
a little longer to understand Mr. Guenther.   He understood
every word that Mr. Guenther said to him, but he did not
catch it quite as quick as he did what I said.   He wouldn't
answer Mr. Guenther so quick, and he would have to re-
peat it more than once, but I didn't have to repeat.
I could understand him better than Mr. Guenther could,
and he could understand me better than he could Mr.
Guenther.   I did not hear Mr. Blossi at any time refuse
to receive $75.

Dr. Morse's testimony with reference to this matter
was substantially as follows:

I was present at the time a settlement was made with
him.   It is my recollection that Mr. Guenther talked mat-
ters over with him before Mr. Tresemer came in.   I under-
stand German fairly well, but Mr. Blossi has a dialect that
is peculiar to himself.   It is low German, and while it is
difficult for me to understand him, I understood a good
deal of what he said as to his needs and wants.   I saw
him sign Exhibit No. One.   Mr. McLaughlin:   State
whether or not you saw any one read or translate Exhibit

No. One to Blossi, and who? A. I saw Guenther and heard him read the paper before Blossi signed it. Exhibit No. Two is the draft that Pitt handed to Blossi. Mr. Blossi, a little time after the settlement, I went downstairs with the rest of them, he called to me to come up and asked me to cash it for him. He said he wanted the gold, or the 'money gilt' he called it, and wanted to know if I could get it for him, and I said that I would, and handed it to the nurse to get the money for him, and she took it upstairs and gave it to him. The first time after the accident when Mr. Pitt called, Mr. Blossi's brother who lives at Radcliffe acted as interpreter. Q. Do you remember anything about him having the cashier of the bank come in, and getting him to deposit it for him the next day? A. Yes; since you mention it, I remember he was uneasy about the money, and wanted me or the nurse to take it, and I told him if he was acquainted with the bank to have the cashier come over and get it for him, which he did.

This is practically the entire record made upon the issue of settlement, and it is apparent therefrom that plaintiff's mind was in a normal condition; that no misrepresentations were made to him of any kind, and no fraud perpetrated. The most that can be claimed from the testimony offered by plaintiff is that he did not understand the contents or purport of the paper signed by him; but this was due to no fault of the defendant or its agent. The interpreters were plaintiff's own friends, and they were not even selected by the defendant company or any of its agents. Dr. Morse made the selection, and there is no intimation that they did not act in the best of faith and tried as well as they could to have plaintiff understand the effect of the papers he was signing. That he did understand it we have no doubt, but, assuming that he did not, there is no claim that defendant was in any way responsible for his lack of knowledge. It did everything it could, paid out its money on the strength of the settlement, and was guilty of no fraud, misrepresentation or deceit. Surely

there must be some way whereby a settlement may be had with one who speaks a foreign language. If due care is used in the selection of an interpreter and every effort made to fully explain matters, and the injured party apparently comprehends and agrees to all that is said and done, his misunderstanding of the situation unknown to and not due to any fault, fraud, or collusion on the part of the other party is not to be chargeable to such other.

In this case plaintiff had it in his power to fully comprehend the situation. He knew the purpose of the meeting. He knew that defendant, through its agent, was endeavoring to pay him something for his injuries and to settle his claim. He received the money offered by the defendant and signed the release and agreement of settlement, knowing, of course, that it must have relation to this matter. The interpreters endeavored to acquaint him with its contents, and, if he did not know of them, it was his own fault. He was in his right mind and in full possession of his mental faculties, and there was no attempt to mislead or in any manner deceive him. His testimony indicates that he knew he was getting the money in payment for his injuries or some of them, and, if he did not understand just what the payment was for, he should have made further inquiries. To say that under this record a jury might disregard the settlement and find a verdict for plaintiff would be equivalent to saying that no settlement can safely be made with one not familiar with the English language. Of course, no such rule should be established. There is no claim that the paper was not correctly translated to plaintiff, and, if he did not know its exact terms, it was his own fault. The case is not different from one where a party having the ability to read and understand a paper fails to do so and signs it without reading. In such case he is bound unless it appears that some fraud or deceit was practiced upon him, either to prevent his reading or by fraudulently stating the contents

of the document. That this is the established rule, see the following among other authorities: *Gulliher v. Railway Co.,* 59 Iowa, 416; *McKinney v. Herrick,* 66 Iowa, 414; *Bonnot Co. v. Newman Bros.,* 108 Iowa, 158; *Bannister v. McIntire,* 112 Iowa, 600; *Insurance Co. v. Lemmon,* 117 Iowa, 691. As bearing upon this identical question we quote the following from *Railway Co. v. Belliwith,* 83 Fed. 437 (28 C. C. A. 358):

A written contract of release can not be annulled or avoided by proof that one of the parties to it, who was sound in mind and able in body, could not read or write, did not know the terms of the agreement, and neglected to ask any one to read it to him when he signed it. A written contract is the highest evidence of the terms of an agreement between the parties to it, and it is the duty of every contracting party to learn and know its contents before he signs and delivers it. He owes this duty to the other party to the contract, because the latter may, and probably will, pay his money and shape his action in reliance upon the agreement. He owes it to the public, which, as a matter of public policy, treats the written contract as a conclusive answer to the question, What was the agreement? If one can read his contract, his failure to do so is such gross negligence that it will estop him from denying it, unless he has been dissuaded from reading it by some trick or artifice practiced by the opposite party. If he can not read it, it is as much his duty to procure some reliable person to read and explain it to him before he signs it as it would be not to read it before he signed it if he were able to do so; and his failure to obtain a reading and explanation of it is such gross negligence as will estop him from avoiding it on the ground that he was ignorant of its contents.

See, also, *Railway Co. v. Difendaffer,* 125 Fed., 893 (62 C. C. A. 1) and cases cited. The case, in so far as the settlement is concerned, is ruled by *Kilmartin v. Railway Co.,* 137 Iowa, 64; *Nason v. Railway Co.,* 130 Iowa, 533; *Douda v. Railway Co.,* 141 Iowa, 82.

Had a jury found for the plaintiff upon this issue, it would have been the duty of the trial court to have granted a new trial; that being true the rul-

2. Trial: direction of verdict.

ing on the motion to direct was correct. *Meyer v. Houck,* 85 Iowa, 319; *Cherry v. Des Moines Leader,* 114 Iowa, 298, and other like cases noticed in 4 McClain's Digest, 3307.

II.   But appellant contends that the trial court was in error in some of its rulings with reference to the testimony bearing upon the issue which we have just been considering.   For example, it is said that, as

3. Physician and patient: confidential communications.

Dr. Morse was plaintiff's physician, his testimony was incompetent.   It is a mistake to assume that a physician can not testify in any case to which his patient is a party.   He is only forbidden to testify when he obtains information by reason of his employment by confidential communications intrusted to him in a professional character, and necessary and proper to enable him to discharge his duties.   This prohibition was not violated in the present case, as an examination of the testimony from this doctor which we have quoted will show.   See *Sutcliffe v. Traveling Men's Ass'n,* 119 Iowa, 220; *Wyland v. Griffith,* 96 Iowa, 24.

Objection was also made to the testimony of the minister, on the ground that it too related to a matter of confidence between the minister and his parishioner.   Mani-

4. Same: minister and parishioner.

festly this objection is without merit.   The minister in this case was simply acting as a friend and interpreter, and what was said had nothing to do with' spiritual affairs.   He was not called by plaintiff for consolation or even advice with reference to spiritual matters.   The objection was clearly without merit.   *State v. Brown,* 95 Iowa, 381.

Counsel rely for a reversal upon the first ruling appearing in the quotation from the testimony heretofore set

out; that is to say, the objection to the question pro-
pounded to plaintiff as to whether he under-
stood that any papers he signed on the day
in question were in settlement of his in-
juries. This question was propounded after the brief in-
troduction to the subject already set forth. It manifestly
called for the conclusion of the witness, but this conclusion
was also a fact which might be testified to at a proper
time. We think the objection might well have been over-
ruled, and are of opinion that this would have been the
proper order. But it appears that thereafter the witness
went into the entire matter at length and was permitted to
give his understanding or misunderstanding of the very
matter inquired about. Hence no prejudice resulted.

*5. EVIDENCE: state of mind: prejudice.*

The claim agent, Pitt, was permitted to testify, in
effect, over plaintiff's objections, that he understood that
plaintiff understood the nature of the transaction. As this
had a material bearing upon the issue of
fraud and the matter could be reached in no
other way, there was no error in the ruling. *Kruse v.
Lumber Co.,* 108 Iowa, 352; *Chew v. O'Hara,* 110 Iowa,
81. If Pitt knew or believed that plaintiff did not under-
stand the nature of the transaction, or the contents of the
paper which plaintiff was asked to sign, this would have
been evidence of fraud or at least of mutual mistake which
would have justified the setting aside of the settlement.
Hence it was proper to show Pitt's understanding or
knowledge by direct testimony from him. These are all
the rulings bearing upon the issue which we believe to be
decisive of the case, and in them there is no prejudicial
error.

*6. SAME.*

We have gone over the testimony with care, and have
set out all that is material upon the point which is re-
garded as decisive, and reach the conclusion that the trial
court did not err in directing a verdict for defendant.

The judgment must be, and it is, *affirmed.*