# IN THE SUPREME COURT OF IOWA

No. 12–0649

Filed May 16, 2014
Amended August 21, 2014

**RICK BERTRAND,**

Appellant,

vs.

**RICK MULLIN** and **THE IOWA DEMOCRATIC PARTY,**

Appellees.

Appeal from the Iowa District Court for Woodbury County, Jeffrey L. Poulson, Judge.

Appeal and cross-appeal from a judgment entered by the district court on a claim for defamation of character. **JUDGMENT OF THE DISTRICT COURT REVERSED; CASE DISMISSED.**

Jeana L. Goosmann and Emilee Boyle Gehling of Goosmann Law Firm, PLC, Sioux City, for appellant.

Mark McCormick of Belin McCormick, P.C., Des Moines, for appellees.

**CADY, Chief Justice.**

In this appeal and cross-appeal, we must decide whether a political campaign advertisement aired on television constituted actionable defamation. The district court overruled a motion for directed verdict at trial, and a jury returned a verdict for the plaintiff. Both parties appealed and raised a variety of claims of error. On our review, we conclude the verdict cannot stand because the action was not supported by sufficient evidence of actual malice. We reverse the judgment of the district court and dismiss the case.

## I. Background Facts and Prior Proceedings.

Rick Bertrand and Rick Mullin were candidates for the Iowa Senate from Sioux City and Woodbury County in the 2010 general election. Bertrand ran as a Republican, and Mullin ran as a Democrat. Mullin was a former chair of the Woodbury County Democratic Party.

Bertrand owned a number of businesses and real estate in the Pearl Street district of Sioux City. From 1999 until 2009, however, he worked as a salesperson and later as district manager for Takeda Pharmaceuticals (Takeda), a large multinational pharmaceutical company. Bertrand worked in the metabolic division of the company, which produced and marketed the diabetes drug Actos. Bertrand did not own stock in Takeda, and his local business interests were unrelated to the pharmaceutical industry.

Another division of Takeda sold a tablet called Rozerem, a prescription sleep aid. Bertrand, however, never personally sold the drug.

In October 2010, Bertrand ran a campaign advertisement on television called "Running from the Past." The advertisement focused on certain current policy positions of Mullin and compared them to

positions Mullin took as Woodbury County Democratic Chair. The advertisement made Mullin angry and offended him. Additionally, his internal polling revealed the advertisement was causing him to lose support. His campaign manager told him: "Bertrand hit you hard. Hit him back harder."

Opposition research conducted on behalf of Mullin revealed a *Los Angeles Times* article about the disclosure by a consumer group of a Food and Drug Administration (FDA) report that expressed concern over the sale of Actos by Takeda. The article reported the FDA had found 388 patients were hospitalized for heart failure after taking Actos. Research also revealed the FDA had criticized the marketing of Rozerem by Takeda, particularly an advertisement that made it appear that Rozerem was being marketed to children. Finally, research uncovered an article from the *Morning Herald* in Sydney, Australia, which reported a consumer advocacy group had declared Takeda "the most unethical drug company in the world."

This research was used as the basis for a television advertisement ultimately run by Mullin in response to the "Running from the Past" advertisement by Bertrand. Mullin and several Iowa Democratic Party staff members discussed the themes and content of the advertisement between October 15 and 17. Mullin initially had significant misgivings about the script. He disliked the proposed tone of the script and found it to be at odds with the positive tenor he believed characterized his campaign. Mullin said:

> I really don't like this new ad at all – it isn't me and it is totally inconsistent with the beautiful print pieces we've been mailing out by the thousands. It also devalues the great TV spot we are already running.
>
> Can't we find a way to be derisive/dismissive of Bertrand's negative attack and then pivot to our positive

message?  I really don't like the positioning of me in this, and it buys into Bertrand's frame.  Let's bust out of his frame and keep positive.

In a later email, Mullin introduced a rewrite of the script as being "less vile."  Eventually, Mullin approved the script.

The advertisement—titled "Secrets"—formed the basis for this lawsuit.  It first aired on television on October 17.  The audio portion of "Secrets" contained the following statements:

Rick Bertrand said he would run a positive campaign but now he is falsely attacking Rick Mullin.  Why?

Because Bertrand doesn't want you to know he put his profits ahead of children's health.

Bertrand was a sales agent for a big drug company that was rated the most unethical company in the world.  The FDA singled out Bertrand's company for marketing a dangerous sleep drug to children.

Rick Bertrand.  Broken promises.  A record of deceit.

At the bottom of the screen during one shot was a written image, which stated in bold capital letters, "BERTRAND'S COMPANY MARKETED SLEEP DRUG TO CHILDREN."

The statements in the advertisement cited to newspaper articles, which also flashed across the television screen.  The sources cited for the statements made in the advertisement focused on Takeda.  There was no mention of the local companies owned by Bertrand.  Mullin admitted he did not know if Bertrand had ever sold Rozerem or marketed dangerous drugs to children at the time the advertisement aired.  When he approved the script, he said he liked the " 'profiting at the expense of children' line."  A friend of Mullin confided in a later email to the Iowa Democratic Party staff, "I guess I thought Bertrand had at least sold the drug in question" and acknowledged "Secrets" was a "pretty flimsy attack."

Bertrand and Mullin engaged in a public debate at a forum sponsored by the Home Builders Association on October 21. At the debate, Bertrand called the "Secrets" advertisement false and demanded Mullin stop airing it. The next day, on October 22, Bertrand filed a lawsuit against Mullin in district court seeking injunctive relief and monetary damages based on defamation. Mullin viewed the lawsuit as a political tactic by Bertrand and did not stop airing the commercial. Mullin last ran the advertisement on October 31, two days before the election on November 2. Bertrand won the election by 222 votes.

The defamation action proceeded to trial. Bertrand identified ten statements in the advertisement he considered defamatory. These statements included nearly every spoken statement from the advertisement and one written statement, as well as statements from the advertisement that were repeated in mailed advertising. Bertrand alleged a broad array of damages, including emotional distress from harassing phone calls, vandalism of a construction site of one of his businesses, ill-treatment on the campaign trail, and economic losses.

The trial court refused to submit Bertrand's claim for punitive damages to the jury. It found he failed to present clear and convincing evidence that Mullin intentionally acted unreasonably.

At the same time, Mullin claimed Bertrand failed to introduce clear and convincing evidence the allegedly defamatory statements were false and made with actual malice. The trial court found eight of the ten allegedly defamatory statements were not defamatory as a matter of law. However, the court submitted two statements from the advertisement to the jury under the claim for defamation. The first statement was: "The FDA singled out Bertrand's company for the marketing of dangerous drugs to children." The second statement was: "BERTRAND'S COMPANY

MARKETED SLEEP DRUG TO CHILDREN." The district court found "a reasonable jury [could] find that these statements imply a false fact, namely that Rick Bertrand personally sold a dangerous sleep drug to children, or that he owns a company that sold a dangerous sleep drug to children."

The jury returned a verdict of $31,000 against Mullin and $200,000 against the Iowa Democratic Party. In response to a motion for judgment notwithstanding the verdict (JNOV), the trial court found no reasonable juror could conclude Takeda was Bertrand's company. It reasoned no reasonable viewer could ignore the statement that Bertrand had been a Takeda sales agent, which immediately preceded the "Bertrand's company" line in the advertisement. Consequently, the court concluded it should have granted a directed verdict for Mullin and the Iowa Democratic Party regarding the alleged implication that Bertrand owned a company that sold Rozerem.

However, the district court concluded a reasonable juror could have believed that the content of the statement by Mullin was that Bertrand *personally* sold Rozerem. The district court reasoned "the language and juxtaposition of the phrases" allowed a reasonable jury to conclude the advertisement implied Bertrand personally sold Rozerem. The district court rejected Mullin's argument that "Secrets" was simply a "guilt by association" advertisement. It reasoned that even if Mullin expressed a legitimate point, a reasonable person hearing the statement could infer that the person personally sold the product. The court stated: "If somebody states that John is a car salesman at A&B car dealership and that A&B sells Fords, it is reasonable to infer that John sells Fords, regardless of what other models A&B actually sells." Additionally, the district court found sufficient evidence to support a

finding of actual malice. Primarily, it reasoned that Bertrand's public denial of the implication that he sold the drug, followed by the filing of his defamation lawsuit the next day, alerted Mullin of the false implication. It then reasoned that the subsequent actions of Mullin and the Iowa Democratic Party in failing to pull the advertisement showed they purposefully avoided the false implication and recklessly disregarded the truth as they continued to broadcast the advertisement. Therefore, the district court denied the motion for JNOV.

On appeal, Mullin contends the district court erred by failing to grant his motion for JNOV. As a part of his arguments, he asserts Bertrand failed to introduce clear and convincing evidence of actual malice. Bertrand claims the district court erred by failing to submit his punitive damages claim to the jury and by granting Mullin's motion for remittitur.

**II.  Scope of Review.**

We normally review the denial of a motion for JNOV for correction of errors at law. *See Dorshkind v. Oak Park Place of Dubuque II, L.L.C.*, 835 N.W.2d 293, 299–300 (Iowa 2013); *see also* Iowa R. App. P. 6.907. Our task is to decide if the district court " 'correctly determined there was sufficient evidence to submit the issue to the jury.' " *Dorshkind*, 835 N.W.2d at 300 (quoting *Easton v. Howard*, 751 N.W.2d 1, 5 (Iowa 2008)). Yet, we have held this standard has been modified slightly in the review of the actual malice element of a defamation lawsuit by *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S. Ct. 710, 11 L. Ed. 2d 686 (1964). We have said:

> "[W]here the *New York Times* 'clear and convincing' evidence requirement applies, the trial judge's summary judgment inquiry as to whether a genuine issue exists will be whether the evidence presented is such that a jury applying that

evidentiary standard could reasonably find for either the plaintiff or the defendant. Thus, where the factual dispute concerns actual malice, clearly a material issue in a *New York Times* case, the appropriate summary judgment question will be whether the evidence in the record could support a reasonable jury finding either that the plaintiff has shown actual malice by clear and convincing evidence or that the plaintiff has not."

*Stevens v. Iowa Newspapers, Inc.*, 728 N.W.2d 823, 830 (Iowa 2007) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255–56, 106 S. Ct. 2505, 2514, 91 L. Ed. 2d 202, 216 (1986)). This same standard applies to any claim that the evidence is insufficient to support a judgment at any stage in the proceedings.

### III. Discussion.

The centuries-old tort of defamation of character protects a person's common law "interest in reputation and good name." *Johnson v. Nickerson*, 542 N.W.2d 506, 510 (Iowa 1996). It does this in a broad way. The tort applies to both written and oral statements, *Schlegel v. Ottumwa Courier*, 585 N.W.2d 217, 221 (Iowa 1998), as well as altered images, *Kiesau v. Bantz*, 686 N.W.2d 164, 178 (Iowa 2004). It also extends beyond the literal meaning of the communication. *Yates v. Iowa W. Racing Ass'n*, 721 N.W.2d 762, 770 (Iowa 2006). The tort recognizes "[i]t is the thought conveyed, not the words, that does the harm." *Turner v. Brien*, 184 Iowa 320, 326, 167 N.W. 584, 586 (1918), *overruled on other grounds by Ragland v. Household Fin. Corp.*, 254 Iowa 976, 981, 119 N.W.2d 788, 791 (1963). Moreover, defamation was, at common law, functionally a strict liability tort. *See Barreca v. Nickolas*, 683 N.W.2d 111, 117 n.2 (Iowa 2004); *see also* Patrick J. McNulty, *The Law of Defamation: A Primer for the Iowa Practitioner*, 44 Drake L. Rev. 639, 718 (1996) (mentioning the "strict liability nature of the defamation tort").

In an ordinary case, a plaintiff establishes a prima facie claim for defamation by showing the defendant "(1) published a statement that (2) was defamatory (3) of and concerning the plaintiff, and (4) resulted in injury to the plaintiff." *Johnson*, 542 N.W.2d at 510. We have previously held the defamatory publication need not be explicit, but may be implied "by a careful choice of words in juxtaposition of statements." *Stevens*, 728 N.W.2d at 828. Yet, a plaintiff who is a candidate for public office becomes a public official. *Monitor Patriot Co. v. Roy*, 401 U.S. 265, 271–72, 91 S. Ct. 621, 625, 28 L. Ed. 2d 35, 41 (1971). When a plaintiff is a public official, the First Amendment adds two elements to the tort that must be established by clear and convincing evidence—the statement must be false and it must be made with actual malice.[1] *See N.Y. Times*,

---

[1] We recognize the United States Supreme Court has indicated it is an open question "whether the *New York Times* standard can apply to an individual defendant rather than to a media defendant." *Hutchinson v. Proxmire*, 443 U.S. 111, 133 n.16, 99 S. Ct. 2675, 2687 n.16, 61 L. Ed. 2d 411, 430 n.16 (1979); *accord Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 20 n.6, 110 S. Ct. 2695, 2706 n.6, 111 L. Ed. 2d 1, 18 n.6 (1990); *Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 779 n.4, 106 S. Ct. 1558, 1565 n.4, 89 L. Ed. 2d 783, 794 n.4 (1986); *see also Obsidian Fin. Grp., LLC v. Cox*, 740 F.3d 1284, 1290 (9th Cir. 2014) (recognizing the Supreme Court has never resolved whether First Amendment protections apply beyond the institutionalized press). Yet, in a case in which the Court rejected a robust First Amendment defense in cases brought by nonpublic plaintiffs involving matters of "purely private concern," *see Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 759–61, 105 S. Ct. 2939, 2945–46, 86 L. Ed. 2d 593, 602–04 (1985) (judgment of the court), a four-Justice dissent and one-Justice concurrence rejected any distinction in First Amendment-protection based on identity of the defendant, *id.* at 781–83, 105 S. Ct. at 2957–58, 86 L. Ed. 2d at 617–18 (Brennan, J., dissenting); *id.* at 772–74, 105 S. Ct. at 2952–53, 86 L. Ed. 2d at 611–12 (White, J., concurring); *see also Flamm v. Am. Ass'n of Univ. Women*, 201 F.3d 144, 149 (2d Cir. 2000) (considering the combined dissent and concurrence of *Dun & Bradstreet* as persuasive).

We have suggested the *New York Times* standard applies to nonmedia defendants, at least when the plaintiff is a public official. *See Anderson v. Low Rent Hous. Comm'n*, 304 N.W.2d 239, 247 (Iowa 1981) ("[W]e find no basis in the plain language of the first amendment that would justify according greater protection to the media than private parties . . . ."). *But see Vinson v. Linn-Mar Cmty. Sch. Dist.*, 360 N.W.2d 108, 118 (Iowa 1984) (distinguishing *Anderson* based on the fact that *Anderson* involved a public official). Our reasoning in *Anderson* closely resembled Justice

376 U.S. at 279–80, 285–86, 84 S. Ct. at 726, 729, 11 L. Ed. 2d at 706, 710.

Under the actual malice prong of a public official defamation claim, the plaintiff bears the burden of showing actual malice by clear and convincing evidence. *Blessum v. Howard Cnty. Bd. of Supervisors*, 295 N.W.2d 836, 843 (Iowa 1980). We have characterized this burden—in the context of showing reckless disregard for the truth—as "substantial." *Stevens*, 728 N.W.2d at 830; *see Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 688, 109 S. Ct. 2678, 2696, 105 L. Ed. 2d 562, 589 (1989) (applying " 'high degree of awareness' " standard (quoting *Garrison v. Louisiana*, 379 U.S. 64, 74, 85 S. Ct. 209, 216, 13 L. Ed. 2d 125, 133 (1964))).

The burden to establish actual malice was deliberately set high by the First Amendment protections recognized in *New York Times*.[2]

---

Brennan's reasoning (apparently representing the reasoning of five Justices) that a distinction based on whether the defendant is a member of the press

> is irreconcilable with the fundamental First Amendment principle that "[t]he inherent worth of . . . speech in terms of its capacity for informing the public does not depend upon the identify of its source . . . ." First Amendment difficulties lurk in the definitional questions such an approach would generate.

*Dun & Bradstreet*, 472 U.S. at 781–82, 105 S. Ct. at 2957, 86 L. Ed. 2d at 617 (Brennan, J., dissenting) (quoting *First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 777, 98 S. Ct. 1407, 1416, 55 L. Ed. 2d 707, 718 (1978)); *see also Anderson*, 304 N.W.2d at 247.

Nevertheless, we do not address the issue in this case. The trial court instructed the jury on Bertrand's claims of libel, slander, and defamation by implication under the actual malice standard defined by *New York Times*. On appeal, Bertrand did not argue that Mullin, as a nonmedia defendant, deserved less protection than offered by *New York Times*. Therefore, we proceed to analyze Bertrand's defamation claim against Mullin under the *New York Times* framework.

[2]We note Mullin and the Iowa Democratic Party have only asserted privilege under the First Amendment to the United States Constitution and not article I, section 7 of the Iowa Constitution. More than a century ago—and more than half a century before the Supreme Court decided *New York Times*—we recognized persons who place themselves in the public sphere are subject to a vastly greater degree of comment,

Consequently, the *New York Times* standard defines a crucial exception to ordinary defamation rules. This exception is based upon a "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *N.Y. Times*, 376 U.S. at 270, 84 S. Ct. at 721, 11 L. Ed. 2d at 701. To promote this ideal, a commentator "is afforded a buffer zone to protect it from the chilling effect which might otherwise cast over it a 'pall of fear and timidity' by raising the spectre of numerous libel actions." *McCarney v. Des Moines Register & Tribune Co.*, 239 N.W.2d 152, 156 (Iowa 1976) (quoting *N.Y. Times*, 376 U.S. at 278, 84 S. Ct. at 725, 11 L. Ed. 2d at 705). In other words, "[t]he prized American right 'to speak one's mind' about public officials and affairs needs 'breathing space to survive.'" *N.Y. Times*, 376 U.S. at 298, 84 S. Ct. at 736, 11 L. Ed. 2d at 719 (Goldberg, J., concurring) (quoting *Bridges v. California*, 314 U.S. 252, 270, 62 S. Ct. 190, 197, 86 L. Ed.

---

criticism, and even ridicule. *See Cherry v. Des Moines Leader*, 114 Iowa 298, 305, 86 N.W. 323, 325 (1901), *abrogated in part on other grounds by Barreca*, 683 N.W.2d at 119–20. Irrespective of the social utility of the *Des Moines Leader*'s old-timey rebuke of the Cherry Sisters' apparently salacious performance, we recognized:

> One who goes upon the stage to exhibit himself to the public, or who gives any kind of a performance to which the public is invited, may be freely criticised. He may be held up to ridicule, and entire freedom of expression is guarantied dramatic critics, provided they are not actuated by malice or evil purpose in what they write. Fitting strictures, sarcasm, or ridicule, even, may be used, if based on facts, without liability, in the absence of malice or wicked purpose. The comments, however, must be based on truth, or on what in good faith and upon probable cause is believed to be true, and the matter must be pertinent to the conduct that is made the subject of criticism. Freedom of discussion is guarantied by our fundamental law and a long line of judicial decisions.

*Id.* at 304, 86 N.W. at 325.

192, 207 (1941) (first quotation); *NAACP v. Button*, 371 U.S. 415, 433, 83 S. Ct. 328, 338, 9 L. Ed. 2d 405, 418 (1963) (second quotation)).

At its core, the First Amendment guarantee "has its fullest and most urgent application precisely to the conduct of campaigns for political office." *Monitor Patriot Co.*, 401 U.S. at 272, 91 S. Ct. at 625, 28 L. Ed. 2d at 41. While "debate on the qualifications of candidates [is] integral to the operation of the system of government established by our Constitution," *Buckley v. Valeo*, 424 U.S. 1, 14, 96 S. Ct. 612, 632, 46 L. Ed. 2d 659, 685 (1976) (per curiam), "an election campaign is a means of disseminating ideas as well as attaining political office," *Ill. State Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 186, 99 S. Ct. 983, 991, 59 L. Ed. 2d 230, 242 (1979). Consequently, constitutional protection for political speech in the context of a campaign extends to "anything which might touch on an official's fitness for office." *Garrison*, 379 U.S. at 77, 85 S. Ct. at 217, 13 L. Ed. 2d at 134. Understandably, the range of private conduct that affects an official's fitness for elective office can be broad. "Few personal attributes are more germane to fitness for office than dishonesty, malfeasance, or improper motivation, even though these characteristics may also affect the official's private character." *Id.*

A statement is made with actual malice when accompanied by "knowledge that it was false or with reckless disregard for its truth or falsity." *Carr v. Bankers Trust Co.*, 546 N.W.2d 901, 904 (Iowa 1996). However, as Justice Black pointed out a half a century ago, actual malice "is an elusive, abstract concept, hard to prove and hard to disprove." *N.Y. Times*, 376 U.S. at 293, 84 S. Ct. at 733, 11 L. Ed. 2d at 716 (Black, J., concurring). A knowing falsehood may be easy to identify in theory,

but any effort to peer into the recesses of human attitudes towards the truthfulness of a statement is certain to be difficult.

" 'Reckless disregard,' it is true, cannot be fully encompassed in one infallible definition." *St. Amant v. Thompson*, 390 U.S. 727, 730, 88 S. Ct. 1323, 1325, 20 L. Ed. 2d 262, 267 (1968). Yet, in the half century the *New York Times* rule has preserved the First Amendment's guarantee of uninhibited commentary regarding public officials and figures, the Supreme Court has crafted some useful guideposts. Most prominently, an early case nearly contemporaneous with *New York Times* opined that statements made with a "high degree of awareness of their probable falsity" may subject the speaker to civil damages. *Garrison*, 379 U.S. at 74, 85 S. Ct. at 216, 13 L. Ed. 2d at 133. The negative implication, of course, is that a court may not award damages against one who negligently communicates a falsehood about a public official. *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 510, 111 S. Ct. 2419, 2429, 115 L. Ed. 2d 447, 468 (1991) ("Mere negligence does not suffice."); *see also Harte-Hanks Commc'ns*, 491 U.S. at 688, 109 S. Ct. at 2696, 105 L. Ed. 2d at 589 (explaining that establishing liability under *New York Times* "requires more than a departure from reasonably prudent conduct"); *McCarney*, 239 N.W.2d at 156 (holding plaintiff failed to present evidence of actual malice because defendant's explanation of the mistaken statement "shows negligence, but no more than that").

The Supreme Court has explained its reasoning:

> [R]eckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant *in fact entertained serious doubts as to the truth of his publication.* Publishing with such doubts shows reckless disregard for truth or falsity and demonstrates actual malice.

*St. Amant,* 390 U.S. at 731, 88 S. Ct. at 1325, 20 L. Ed. 2d at 267 (emphasis added). In a later case, the Court clarified that "[t]he standard is a subjective one." *Harte-Hanks Commc'ns,* 491 U.S. at 688, 109 S. Ct. at 2696, 105 L. Ed. 2d at 589.

Candidly, the *New York Times* standard tilts the balance strongly in favor of negligent defendants:

> It may be said that such a test puts a premium on ignorance, encourages the irresponsible publisher not to inquire, and permits the issue to be determined by the defendant's testimony that he published the statement in good faith and unaware of its probable falsity.

*St. Amant,* 390 U.S. at 731, 88 S. Ct. at 1326, 20 L. Ed. 2d at 267. However, the Supreme Court has indicated that mere protestations of good faith and declarations that the speaker believed the statement to be true are not automatically sufficient to avoid liability. *Id.* at 732, 88 S. Ct. at 1326, 20 L. Ed. 2d at 267–68. The Court explained:

> The finder of fact must determine whether the publication was indeed made in good faith. Professions of good faith will be unlikely to prove persuasive, for example, where a story is fabricated by the defendant, is the product of his imagination, or is based wholly on an unverified anonymous telephone call. Nor will they be likely to prevail when the publisher's allegations are so inherently improbable that only a reckless man would have put them in circulation. Likewise, recklessness may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports.

*Id.* Thus, while courts look at the speaker's subjective state of mind regarding the truthfulness of his or her statement, mere subjective belief in the statement's truth is insufficient to avoid liability if objective indications—such as pure fabrication of the story—wholly belie the credibility of the statement.

However, "failure to investigate before publishing, even when a reasonably prudent person would have done so, is not sufficient to

establish reckless disregard." *Harte-Hanks Commc'ns*, 491 U.S. at 688, 109 S. Ct. at 2696, 105 L. Ed. 2d at 589. Similarly, "[r]eliance on a single source, in the absence of a high degree of awareness of probable falsity, does not constitute actual malice." *Woods v. Evansville Press Co.*, 791 F.2d 480, 488 (7th Cir. 1986); *accord N.Y. Times Co. v. Connor*, 365 F.2d 567, 576 (5th Cir. 1966). Nor does a "shoddy" investigation constitute actual malice. *See Dodds v. Am. Broad. Co.*, 145 F.3d 1053, 1062–63 (9th Cir. 1998); *see also Faigin v. Kelly*, 978 F. Supp. 420, 429 (D.N.H. 1997) ("[F]ailure to follow journalistic standards and lack of investigation may establish irresponsibility or even possibly gross irresponsibility, but not reckless disregard of truth."). Indeed, sources of information need not be completely neutral. *See Dodds*, 145 F.3d at 1062 (holding that a reporter's deeply religious source who expressed skepticism about a judge's reliance on a crystal ball to decide cases was not so biased as to render her statements unreliable).

Mullin and the Iowa Democratic Party challenge the judgment entered on the claim of defamation on several grounds, including the sufficiency of evidence to support the actual malice element of the tort. If the evidence was insufficient to support actual malice, the judgment must be reversed, and we need not address any further issues raised on appeal. Accordingly, we turn to consider the sufficiency of evidence to support the element of actual malice.

In considering the actual malice element of the tort, we must decide if the evidence supports a finding that Mullin and the Iowa Democratic Party "in fact entertained serious doubts as to the truth" of the implied communication in the commercial—that Bertrand personally sold a dangerous drug—or if they had "a high degree of awareness of [its] probable falsity." *St. Amant,* 390 U.S. at 731, 88 S. Ct. at 1326, 20

L. Ed. 2d at 267 (first quotation); *Garrison*, 379 U.S. at 74, 85 S. Ct. at 216, 13 L. Ed. 2d at 133 (second quotation). In making this determination, we "consider the factual record in full." *Harte-Hanks Commc'ns*, 491 U.S. at 688, 109 S. Ct. at 2696, 105 L. Ed. 2d at 589.

Bertrand argues actual malice was supported by the evidence in a number of ways. First, Bertrand claims the evidence showed Mullin and the Iowa Democratic Party knew the implication in the commercial at issue was false because they knew that none of his Sioux City companies sold drugs and they did not know which division within the pharmaceutical company Bertrand worked in or which division of the company sold the drug in dispute. Second, Bertrand claims Mullin and the Iowa Democratic Party should have known the implication in the commercial was false because Mullin expressed doubts about the commercial before it aired. Third, Bertrand claims actual malice was supported by evidence that Mullin and the Iowa Democratic Party acquired ill will towards him after he aired his own hard-hitting commercial. Fourth, Bertrand asserts the jury could have found actual malice because the purpose of the commercial was to curtail electoral support for Bertrand. Finally, Bertrand asserts actual malice was supported by evidence that the commercial continued to be aired by Mullin after he was told it was false.

We first consider the evidence to support a finding that Mullin and the Iowa Democratic Party had actual knowledge of the falsity of the implied statement in the commercial. In doing so, we clarify that the district court ultimately found the only actionable defamation claim was based on the implication that Bertrand sold drugs to children, reported

to be dangerous, when he worked for a pharmaceutical company.[3]  Thus, any knowledge by Mullin and the Iowa Democratic Party that Bertrand's

---

[3]The district court ultimately concluded it should have directed a verdict in Mullin's favor on the alleged implication that Bertrand owned a company that sold Rozerem.  In doing so, the district court did not consider whether Mullin intended to convey the implication.  Instead, it ruled the "Secrets" commercial was not capable of bearing the implication as a matter of law, reasoning no reasonable viewer could ignore the "sales agent" language immediately preceding the "Bertrand's company" language. *See Stevens*, 728 N.W.2d at 830 (" 'The court determines whether . . . a communication is capable of bearing a particular meaning, and . . . whether that meaning is defamatory.' "  (quoting Restatement (Second) of Torts § 614, at 311 (1965))).  Consequently, Mullin prevailed on his argument that the commercial made no implication that Bertrand owned a company that sold Rozerem.  We agree with the district court's conclusion.

However, we note that in the district court, Mullin argued that, at least in the First Amendment context, a defamation-by-implication plaintiff must prove the defendant subjectively endorsed or intended the implication in the publication.  *See Chapin v. Knight-Ridder*, 993 F.2d 1087, 1092–93 (4th Cir. 1993) ("The language must not only be reasonably read to impart the false innuendo, but it must also affirmatively suggest that the author intends or endorses the inference."); *Howard v. Antilla*, 191 F.R.D. 39, 44 (D.N.H. 1999) ("To prove libel by implication Howard must demonstrate that Antilla subjectively or actually intended to impart the defamatory implication of the reported rumor."); *see also Dodds*, 145 F.3d at 1064 (noting every federal circuit court to consider the issue has required the plaintiff to prove the defendant intended a defamatory inference to be drawn and collecting cases).  Stated differently, in the First Amendment context, it is not enough that the language of the publication can "be reasonably read to impart the false innuendo." *Chapin*, 993 F.2d at 1093.  The Ninth Circuit considers the subjective-intent requirement necessary in public official defamation claims because imposing liability in the absence of some proof of intent "eviscerates the First Amendment protections established by *New York Times*" by permitting "liability to be imposed not only for what was not said but also for what was not intended to be said." *Newton v. Nat'l Broad. Co.*, 930 F.2d 662, 681 (9th Cir. 1990); *see also Woods*, 791 F.2d at 488 ("A publisher reporting on matters of general or public interest cannot be charged with the intolerable burden of guessing what inferences a jury might draw from an article and ruling out all possible false and defamatory innuendoes that could be drawn from the article.").

The district court agreed with Mullin that the subjective-intent showing contemplated by *Chapin* and *Newton* is a required one.  Bertrand did not raise a claim of error regarding this aspect of the ruling on appeal but only mentioned it in his reply brief in response to the issues raised by Mullin on cross-appeal.  Similarly, Mullin did not heavily rely on this point in his cross-appeal.  We recognize defamation by implication is "an area of law 'fraught with subtle complexities.' " *Guilford Transp. Indus., Inc. v. Wilner*, 760 A.2d 580, 596 (D.C. 2000) (quoting *White v. Fraternal Order of Police*, 909 F.2d 512, 518 (D.C. Cir. 1990)).  In light of the absence of thorough briefing on the issue or the necessity that we decide it as a factual matter, we decline to address the subjective-intent requirement in this opinion. *Cf. State v. Hoeck*, 843 N.W.2d 67, 71 (Iowa 2014) (exercising discretion not to address an issue in the absence of thorough

Sioux City businesses never marketed drugs to children has no impact on the pertinent question whether they knew Bertrand never actually sold a dangerous drug to children when he worked for the pharmaceutical company. Instead, the evidence of actual malice necessary to support the implied defamation in this case centers on knowledge of the falsity of the implied statement that Bertrand personally marketed Rozerem, not on knowledge that he did not own the company that marketed the drug or that the businesses he actually owned did not market the drug.

The evidence at trial established that Mullin and the Iowa Democratic Party did *not* know if Bertrand was personally responsible in any way for marketing or selling the drug. They conducted some research for the purpose of running an attack advertisement and concluded from this research that Bertrand worked for the drug company and the company marketed the drug. The research revealed the FDA and others criticized Takeda for selling Rozerem. These statements were true and formed the basis for their claim that Bertrand was associated with an unethical business. Yet, Mullin and the Iowa Democratic Party did not look into the matter further to uncover the complete story that would have told them that Bertrand had nothing to do with the marketing of the drug other than to work for the company that marketed it. The truth, of course, was that Bertrand never worked in the particular division of the company that marketed the drug and

---

briefing and full development of factual issues necessary to decide an issue raised for the first time on appeal). Thus, we only consider the implied claim that Bertrand personally sold Rozerem. As above, we decide the case solely on the actual malice ground and express no opinion regarding whether Mullin or any staff of the Iowa Democratic Party subjectively endorsed or intended the implication that Bertrand personally sold or marketed Rozerem.

never sold the drug. Nevertheless, there was no evidence that Mullin or the Iowa Democratic Party knew the implied statement that Bertrand sold the drug was false.

Without evidence of actual knowledge, we turn to consider if the implied statement was made with reckless disregard for its truth or falsity. We begin by considering the degree of awareness of the probable falsity and any doubts that may have existed about the truth or falsity of the implied statement.

Mullins and the Iowa Democratic Party asserted the implication that Bertrand sold a dangerous drug was made in good faith because they only wanted to inform voters that Bertrand was associated with an unethical company. While this assertion is alone insufficient to conclusively establish the absence of malice, *see St. Amant*, 390 U.S. at 732, 88 S. Ct. at 1326, 20 L. Ed. 2d at 268, it is important to recognize that the nondefamatory implication Mullin and the Iowa Democratic Party sought to communicate—Bertrand was associated with an unethical company that sold a dangerous drug—can be implied from the advertisement. Bertrand established the implication was false, but the general background story from which both implications were derived was not false. Thus, the defamatory statement in this case was not built on a totally fabricated story as the Court opined might support a finding of actual malice in other cases. *See id.* (identifying "where a story is fabricated by the defendant" as possible evidence of actual malice).

It is also important to observe that the sources of information used to gather the background information for the advertisement were not so unreliable as to be unworthy of credence and indicative of reckless disregard for the truth. *See id.* ("[R]ecklessness may be found where there are obvious reasons to doubt the veracity of the informant or the

accuracy of his reports."). Some of the reports may not have been neutral, but mere reliance on sources with predisposed viewpoints does not establish actual malice concerning the falsity of implied statements. *See Dodds*, 145 F.3d at 1062. This case does not contain evidence of patently unreliable sources to support actual malice. Additionally, there was evidence that Mullin and the Iowa Democratic Party did not even subjectively entertain the idea that the implication that Bertrand sold Rozerem was false. There was some evidence that Mullin and the staff with the Iowa Democratic Party assumed Bertrand sold the drug.

The broader background setting of the advertisement must also be considered. Modern political campaigns exist within news cycles that often require overnight action, especially as the campaign closes in on the day of the election. This backdrop supports the need for "breathing room" recognized by the First Amendment to permit meaningful political speech to survive. It is a part of this case and militates against the finding of a subjective awareness of falsity needed to support actual malice.

We next consider the evidence that Mullin initially maintained a strong dislike for the tone of the commercial as proof of actual malice. While this is true, the doubts expressed by Mullin are irrelevant unless related to the truth of the statements. *See St. Amant*, 390 U.S. at 731, 88 S. Ct. at 1325, 20 L. Ed. 2d at 267. The indispensable consideration in this case concerns the subjective attitudes of Mullin and individuals of the Iowa Democratic Party *regarding the truth* of the implication. *See Harte-Hanks Commc'ns*, 491 U.S. at 688, 109 S. Ct. at 2696, 105 L. Ed. 2d at 589. There was no evidence that the concerns expressed by Mullin pertained to the falsity of any statements. The expressions of doubt were not evidence of actual malice, but were pragmatic and

expedient considerations of tenor and political image-crafting with which the First Amendment is fundamentally unconcerned.

We next consider the evidence that Mullin was angry at Bertrand for running his negative campaign advertisement and sought to "hit back" hard at him. This is the type of evidence, however, that demonstrates common law actual malice. *See Winckel v. Von Maur, Inc.*, 652 N.W.2d 453, 459 (Iowa 2002), *abrogated on other grounds by Barreca*, 683 N.W.2d at 119, 123. As used in the First Amendment context, "actual malice" is only a helpful "shorthand," *Masson*, 501 U.S. at 511, 111 S. Ct. at 2430, 115 L. Ed. 2d at 468, and "has nothing to do with bad motive or ill will," *Harte-Hanks Commc'ns*, 491 U.S. at 666 n.7, 109 S. Ct. at 2685 n.7, 105 L. Ed. 2d at 576 n.7. "[U]nlike the common law definition of actual malice, *New York Times* actual malice focuses upon the attitudes of defendants vis-à-vis the truth of their statements, as opposed to their attitudes towards plaintiffs." *Barreca*, 683 N.W.2d at 120.

Thus, under *New York Times*, a plaintiff cannot demonstrate actual malice "merely through a showing of ill will or ' "malice" in the ordinary sense of the term.' " *Stevens*, 728 N.W.2d at 831 (quoting *Harte-Hanks Commc'ns*, 491 U.S. at 666, 109 S. Ct. at 2685, 105 L. Ed. 2d at 576). Stated differently, "[a]ctual antagonism or contempt has been held insufficient to show malice." *McCarney*, 239 N.W.2d at 156. We note the Supreme Court has commented that "it cannot be said that evidence concerning motive or care never bears any relation to the actual malice inquiry" and opined that such an attitude may be circumstantially probative of the defendant's attitude towards the truth of the statement at issue. *Harte-Hanks Commc'ns*, 491 U.S. at 668, 109 S. Ct. at 2686, 105 L. Ed. 2d at 577. But, the evidence of alleged enmity proffered here

does not tend to show any doubts about the truth of the information conveyed in the advertisement. The uninhibited debate the First Amendment envisions would be undermined if liability attached merely upon proof the speaker "spoke out of hatred; even if he did speak out of hatred, utterances honestly believed contribute to the free interchange of ideas and the ascertainment of truth." *Garrison*, 379 U.S. at 73, 85 S. Ct. at 215, 13 L. Ed. 2d at 132.

We next consider the claim by Bertrand that actual malice was established because the very purpose of the commercial was to attack, and thereby negatively affect, a candidate's reputation. An "intent to inflict harm" is insufficient to demonstrate a reckless disregard for the truth. *McCarney*, 239 N.W.2d at 156; *see also Garrison*, 379 U.S. at 73–74, 85 S. Ct. at 215, 13 L. Ed. 2d at 132. "There must be an intent to inflict harm *through falsehood*." *McCarney*, 239 N.W.2d at 156. The very point of the trenchant public discourse protected under the legal standards of *New York Times* is oftentimes to weaken the support for political rivals in future elections: " '[S]elfish political motives,' " which naturally and expectedly accompany such acicular criticism, do not reduce the value of free speech. *See Garrison*, 379 U.S. at 73–74, 85 S. Ct. at 215, 13 L. Ed. 2d at 132 (quoting Dix W. Noel, *Defamation of Public Officers and Candidates*, 49 Colum. L. Rev. 875, 893 n.90 (1949)). The standards of *New York Times* do not constrain First Amendment protection to political discourse of a sterile, academic character or an undiluted high-minded nature. The First Amendment protects the use of "rhetorical hyperbole," *Greenbelt Coop. Publ'g Ass'n v. Bresler*, 398 U.S. 6, 14, 90 S. Ct. 1537, 1542, 26 L. Ed. 2d 6, 15 (1970), and "imaginative expression[s]" designed to evoke contempt for the targets of protected speech, *Old Dominion Branch No. 496, Nat'l Ass'n of Letter Carriers, AFL-*

*CIO v. Austin*, 418 U.S. 264, 285–86, 94 S. Ct. 2770, 2782, 41 L. Ed. 2d 745, 763 (1974). After all, "[r]idicule is often the strongest weapon in the hands of a public writer." *Cherry v. Des Moines Leader*, 114 Iowa 298, 305, 86 N.W. 323, 325 (1901), *abrogated in part on other grounds by Barreca*, 683 N.W.2d at 119–20.

It is not enough to assert that the ordinary purpose of a defamation action is to vindicate and protect a person's common law reputational interest. The First Amendment protects public discourse— even in the form of withering criticism of a political opponent's past dealings or associations—unless the lodged attack is clearly shown to be false and made with actual malice. *See Monitor Patriot Co.*, 401 U.S. at 274–77, 91 S. Ct. at 626–28, 28 L. Ed. 2d at 42–44 (discussing attacks based on private conduct in political campaigns); *Garrison*, 379 U.S. at 72–73, 85 S. Ct. at 215, 13 L. Ed. 2d at 132 ("[W]here the criticism is of public officials and their conduct of public business, the interest in private reputation is overborne by the larger public interest, secured by the Constitution, in the dissemination of truth."); *see also N.Y. Times*, 376 U.S. at 279–80, 94 S. Ct. at 726, 11 L. Ed. 2d at 706; *cf. NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 910, 102 S. Ct. 3409, 3424, 73 L. Ed. 2d 1215, 1234 (1982) ("Speech does not lose its protected character . . . simply because it may embarrass others or coerce them into action."). After all, *New York Times* and its progeny even reach so far as to protect pillorying barbs some may regard as offensive and outrageous. *See Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 55, 108 S. Ct. 876, 882, 99 L. Ed. 2d 41, 52 (1988) (rejecting an "[o]utrageousness" exception to traditional public official tort suit rules). A contrary rule would efface constitutional protection for political commentary; "liberty of speech and of the press guaranteed by the

constitution [would be] nothing more than a name." *Cherry*, 114 Iowa at 305, 86 N.W. at 325.

Finally, we reject the claim that actual malice was established by the evidence that Mullin continued to air the commercial after Bertrand publicly told him the implication was false. *See Harte-Hanks Commc'ns*, 491 U.S. at 691 n.37, 109 S. Ct. at 2698 n.37, 105 L. Ed. 2d at 591 n.37 ("Of course, the press need not accept 'denials, however vehement; such denials are so commonplace in the world of polemical charge and countercharge that, in themselves, they hardly alert the conscientious reporter to the likelihood of error.' " (quoting *Edwards v. Nat'l Audubon Soc'y, Inc.*, 556 F.2d 113, 121 (2d Cir. 1977))). A finding of actual malice based on this circumstance in this case would significantly chill constitutionally protected speech. *See N.Y. Times*, 376 U.S. at 286, 84 S. Ct. at 729, 11 L. Ed. 2d at 710 (holding failure to retract an allegedly defamatory statement is not, by itself, "adequate evidence of malice for constitutional purposes"). The actual malice standard cannot be applied to make a speaker who negligently makes an inaccurate statement liable based on evidence that may amount to a good-faith refusal to back down.

Such a result is anathema to the First Amendment both as originally conceived and in the context of the *New York Times* doctrine laid down half a century ago. *See N.Y. Times*, 376 U.S. at 275, 84 S. Ct. at 723, 11 L. Ed. 2d at 703 ("The right of free public discussion of the stewardship of public officials was thus, in Madison's view, a fundamental principle of the American form of government."). We understand that unscrupulous individuals were certainly capable of using "calculated falsehood[s]" at the time the First Amendment was adopted. *Garrison*, 379 U.S. at 75, 85 S. Ct. at 216, 13 L. Ed. 2d at 133. But, we need to look no further than the Sedition Act of 1798 to further

understand that equally unscrupulous individuals would use the coercive force of government to censor their critics and retain power. S*ee N.Y. Times*, 376 U.S. at 273–76, 84 S. Ct. at 722–24, 11 L. Ed. 2d at 702–04. Indeed, as the Court recognized in *New York Times*, "[a]lthough the Sedition Act was never tested in [the Supreme Court], the attack upon its validity has carried the day in the court of history." *Id.* at 276, 84 S. Ct. at 723, 11 L. Ed. 2d at 704.

We reiterate that the actual malice element does not allow a defendant to purposefully avoid discovering the truth. *Stevens*, 728 N.W.2d at 831 (citing *Harte-Hanks Commc'ns*, 491 U.S. at 692, 109 S. Ct. at 2698, 105 L. Ed. 2d at 591). Moreover, we acknowledge actual malice could be derived from the actions of a candidate in continuing to run an advertisement after being informed of a false implication in the advertisement. It goes without saying that a speaker who repeats a defamatory statement after being informed of the statement's unambiguous falsity does so at the peril of generating an inference of actual malice.

However, two factors in this case do not permit actual malice to be established by evidence that Mullin and the Iowa Democratic Party continued to run the advertisement. First, the false implication exposed by Bertrand did not undermine or eliminate the political relevance of the nondefamatory implication from the advertisement intended by Mullin that Bertrand had associated with an unethical business. This legitimate implication remained speech related to the breathing room that the actual malice standard exists to protect.

Second, and more importantly, the political forum used by Bertrand to communicate the false implication was not an environment suited to alert Mullin or the Iowa Democratic Party of the likelihood of

error. *See Curtis Publ'g Co. v. Butts*, 388 U.S. 130, 169–70, 87 S. Ct. 1975, 1999, 18 L. Ed. 2d 1094, 1119 (1967) (Warren, C.J., concurring in the result) (opining liability could be imposed where "no additional inquiries were made even after the editors were [privately and through an attorney] notified by respondent and his daughter that the account, *to be published* was absolutely untrue" (emphasis added)).  Bertrand chose to inform Mullin that the implication was false at a political forum in front of an audience of prospective voters.  Even if Bertrand was using the forum to communicate the truth so that Mullin would stop running the advertisement, he also necessarily used the forum and the subsequent filing of a defamation lawsuit to score political points and seize the public moment as a means to achieve a political advantage.  This latter objective undermined Bertrand's argument that Mullin's failure to stop running the advertisement in response to his actions showed reckless disregard for the truth.  A candidate does not purposely avoid the truth if the truth is buried in political grandstanding and rhetoric.

Overall, we conclude the evidence failed to establish actual malice.  The failure to write the advertisement in a way to avoid the false implication in this case may have been negligence, but it did not rise to the level of reckless disregard for the truth.  *See McCarney*, 239 N.W.2d at 156.  It is the obligation of the courts to carefully review the evidence in each case to make sure the high standard of proof in a defamation action by one political candidate against another political candidate is met.  The evidence in this case failed to support a high degree of subjective awareness of falsity needed for a public official to recover for defamation.

The result of this case is not to imply actual malice cannot exist within the rough and tumble Wild West approach to negative

commercials that have seemingly become standard discourse in many political campaigns. Protection from defamatory statements does exist and should exist, but the high standards established under the First Amendment to permit a free exchange of ideas within the same discourse must also be protected. Among public figures and officials, an added layer of toughness is expected, and a greater showing of culpability is required under our governing legal standards to make sure the freedom of political speech, even when it sounds like speech far removed from the dignity of the office being sought, is not suppressed or chilled.

While the Constitution has delivered the freedom of speech to all with just a few simple words, the history and purpose of those iconic words are immense and powerful, and have solidified a long-standing right for people in this country, including public officials, to criticize public officials. Of course, this does not mean greater civility in public discourse would not better serve democracy. Moreover, no right is absolute. Nevertheless, the protective constitutional line of free speech in the arena of public officials is drawn at actual malice. Within this arena, speech cannot become actionable defamation until the line has been crossed. It was not in this case.

### IV. Conclusion.

We conclude the record failed to support sufficient evidence of actual malice. Bertrand failed to meet his burden to prove the actual malice element of defamation. Accordingly, we need not address the other issues raised on appeal. The judgment must be reversed and the case dismissed.

**JUDGMENT OF THE DISTRICT COURT REVERSED; CASE DISMISSED.**

All justices concur except Appel and Mansfield, JJ., who take no part.