# IN THE COURT OF APPEALS OF IOWA

No. 23-1944
Filed March 19, 2025

**BRIAN R. SHOCK,**
    Petitioner-Appellant/Cross-Appellee,

**vs.**

**MATTHEW J. KETTMAN, M.D. and FIAT FAMILY MEDICINE, P.L.L.C., an Iowa Limited Liability Company, f/k/a KETTMAN PRANGER FAMILY MEDICINE, P.L.L.C., also f/k/a KETTMAN FAMILY PRACTICE, P.L.L.C., a/k/a KPFM, P.L.L.C., each an Iowa Limited Liability Company,**
    Defendants-Appellees/Cross-Appellants.

_____

Appeal from the Iowa District Court for Black Hawk County, Andrea J. Dryer, Judge.

The plaintiff appeals, and the defendants cross-appeal, from the district court's grant of summary judgment in a defamation lawsuit. **AFFIRMED ON APPEAL; CROSS-APPEAL DISMISSED AS MOOT.**

Richard A. Bartolomei of Bartolomei & Lange, Des Moines, and Thomas P. Frerichs of Frerichs Law Office, P.C., Waterloo, for appellant/cross-appellee.

Timothy C. Boller of Weilein & Boller, P.C., Cedar Falls, and Michael D. Schwartz of Schwartz Law Firm, Oakdale, Minnesota, for appellees/cross-appellants.

Considered by Greer, P.J., and Ahlers and Badding, JJ.

**BADDING, Judge.**

Former police officer Brian Shock and his wife were patients of family physician, Dr. Matthew Kettman. While he was treating the Shocks for their chronic pain, Dr. Kettman became concerned about inconsistencies in a report detailing the prescription pain medications used by Shock's wife. Because Shock's wife denied filling those prescriptions, Dr. Kettman suspected possible illegal dispensing or diversion of the medications by the pharmacy or a physician. He reported his concerns to the pharmacy and medical licensing boards, which triggered a law enforcement investigation of Shock. Special agents interviewed Dr. Kettman three times, focusing on whether Shock used his position as a police officer to coerce doctors into prescribing narcotic pain medications to Shock and his wife. Shock claims that during these interviews, Dr. Kettman made defamatory statements about him, including that Shock was a "dirty cop" who shared pain pills with his wife.

After federal and state prosecutors declined to prosecute Shock, he sued Dr. Kettman and his medical clinic, Fiat Family Medicine, P.L.L.C., for defamation. The defendants moved for summary judgment, arguing the alleged defamatory statements were (1) statutorily privileged; (2) nonactionable opinion; and (3) qualifiedly privileged. The district court granted summary judgment for the defendants on the qualified privilege ground but denied the others. Shock appeals, and the defendants cross-appeal.

## I. Background Facts and Proceedings

Brian Shock was assaulted while on duty as a police officer in 2010. He suffered a fractured vertebrae in his neck that over time caused radiating pain,

numbness, and severe migraines. After treating with another doctor for about a year, Shock began seeing Dr. Matthew Kettman for his chronic pain. When Dr. Kettman took over his care, Shock was already taking prescription pain pills. Dr. Kettman continued that medication, but he had Shock sign a pain contract promising to, among other things, submit to urine toxicology screens.

According to Dr. Kettman, Shock was initially resistant to the screens because, as his police department's crime lab investigator, he oversaw the property room and the city's drug takeback program, which required him to incinerate controlled substances. Dr. Kettman assured Shock that handling those drugs would not affect the results of the urine toxicology screens, but he said Shock still had "some hesitation or resistance to getting those done." Shock eventually complied, and his screen was fine. But Dr. Kettman flagged three later screens as suspicious.[1] Despite these suspicious screens, Dr. Kettman said that he always felt like he could trust Shock "a little more than your average patient" because he was "an investigator, more respected." That trust began to erode when Shock's wife, Candace, became Dr. Kettman's patient.

Candace, like her husband, suffered from chronic pain. Some of her health issues included headaches, severe leg pain, and stomach pain. She often went to Shock's appointments with Dr. Kettman and, according to Dr. Kettman, "directed a lot" of Shock's care. Candace was also the one who would call for refills on

---

[1] Shock could not produce urine for one screen. The second was a positive screen for hydrocodone, even though Shock had been prescribed oxycodone. However, Dr. Kettman believed Shock's explanation that his mother-in-law brought him an old prescription when he was in the hospital overnight with his wife. And the third was a screen that Shock missed because of work, although he provided a sample later that day.

Shock's pain pills, at times reporting that there were issues with the dates or amounts on the prescriptions. Although Dr. Kettman said that "things were weird at times," he would write Shock a new prescription when asked.

In 2015, Candace started seeing Dr. Kettman for her own pain management. Before prescribing her any narcotic pain medication, Dr. Kettman searched her name in the statewide prescription monitoring program.[2] He discovered that in August, Candace had filled "like 300 or 360 Vicodins or something like that" from a pharmacy in Cedar Rapids. Dr. Kettman was shocked at the amount and showed Candace the report. She denied filling the prescriptions, which led Dr. Kettman to believe that the pharmacy or a physician might be diverting pills for profit. While she was in Dr. Kettman's office, Candace called Shock and told him about the report. Dr. Kettman spoke to Shock, who told Dr. Kettman that he would start an investigation into the pharmacy. Although Dr. Kettman wanted to contact the Iowa Board of Pharmacy and the Iowa Board of Medicine, Shock asked him to wait "because he didn't want to spook anybody" that might be involved.

As part of his investigation, Shock told Dr. Kettman that he left a "dummy prescription" with the pharmacy, hoping "the criminal would fill it and they would get it on camera and make the arrest and bust up the ring." He also told Dr. Kettman that he had turned everything over to the Tri-County Drug Taskforce. Over the next few months, Dr. Kettman asked Shock for updates on the

---

[2] This program is "run by the Iowa Board of Pharmacy and provides authorized providers and pharmacists with information regarding their patients' use of controlled substances." *Andrew v. Hamilton Cnty. Pub. Hosp.*, 960 N.W.2d 481, 486 n.1 (Iowa 2021).

investigation. But by March 2016, it seemed to Dr. Kettman like the case had "fizzled out." So he reported his concerns to the pharmacy and medicine licensing boards.

The Board of Pharmacy opened an investigation, which cleared the pharmacy and physician involved with the prescriptions of any wrongdoing but implicated the Shocks. The board's investigator told Dr. Kettman that there was no record that a "dummy prescription" had been left with the pharmacy or written by Candace's physician in Cedar Rapids. The investigator also contacted the drug taskforce and was informed that no official case had ever been opened, although Shock did have a short conversation with someone on the taskforce. In the end, the investigator told Dr. Kettman that the Shocks were lying, and the investigator referred the case to the Iowa Division of Criminal Investigation.

After learning the results of the board's investigation, Dr. Kettman no longer felt comfortable prescribing the Shocks narcotics, so he referred them to a pain specialist. The Shocks were upset and contacted an attorney. Over his years of treating Shock, Dr. Kettman had heard them hint at suing doctors they were displeased with. Concerned that he was next, Dr. Kettman offered to talk to their attorney to "help smooth things out." The attorney verified that the Shocks were planning to sue the pharmacy board and its investigator for slander. He also asked Dr. Kettman to continue prescribing narcotics for the Shocks. Dr. Kettman refused and continued trying to treat the Shocks with non-narcotic pain medicine.

Meanwhile, Candace saw the pain specialist in September and was given a prescription for thirty oxycodone pills. Four days later, she got another oxycodone prescription from a different physician. And two days after that,

Candace persuaded Dr. Kettman to prescribe her more oxycodone while she was in the hospital. When the pain specialist discovered these overlapping prescriptions, he told the Shocks at an appointment in November that he was terminating their care, although he offered to continue prescribing Candace's medications for the next thirty days. The specialist told Shock that he had "concerns for his medication use," noting that

> in the month of April 2016 [Shock] received 240 tablets of oxycodone and some of these he paid cash for and also in December of 2015 he received 270 tablets of oxycodone and some of these he paid cash for. . . . I discussed with him I am concerned that he may have a problem and that this needs to be resolved. I discussed with him I am willing to provide him care for the next 30 days but then I discussed with him I am terminating this relationship and this has to be addressed with Dr. Kettman. I discussed with him my concerns are that this is somewhat out of control and that he needs to be considered weaned off his medications. I discussed with him at least what I am seeing radiographically on his MRI . . . that his MRI was really somewhat benign.

The specialist gave Shock a refill on his oxycodone prescription but cautioned him to take the pills "as prescribed and not as he has been taking them in the past."

The Shocks immediately demanded to be seen by Dr. Kettman. After they called his receptionist multiple times, Dr. Kettman agreed to see them over the lunch hour. During their appointment, Candace threatened to sue the pain specialist, the pharmacy board, and Dr. Kettman's head nurse. She told Dr. Kettman that she was worried about going through withdrawal because the pain specialist would not prescribe her any more narcotic medication. So Dr. Kettman wrote her another prescription to taper her off. But an hour later, after they had filled that prescription, Shock texted Dr. Kettman that they "just

remembered" the pain specialist "did say he would give her 10 pills a week and come back each week for 30 days."

After that incident, Dr. Kettman sent the Shocks a certified letter ending their professional relationship. Just a few days later, on November 18, 2016, Dr. Kettman was interviewed by a special agent with the Iowa Division of Criminal Investigation to determine whether the Shocks had extorted Dr. Kettman by "using the threat of a lawsuit in order to obtain prescription pain medicine." Dr. Kettman had a second interview with the agent on November 22, pursuant to a subpoena. The department referred the case to the Federal Bureau of Investigation and the Drug Enforcement Administration the next month, and Dr. Kettman was subpoenaed for another interview in January 2017, this time with federal agents. Shock was placed on administrative leave during the federal investigation. Later that year, the federal agents presented the results of their investigation to federal and state prosecutors, who declined prosecution.

Around the same time, the police department notified Shock that he was facing a disciplinary inquiry. Shock chose to resign instead. In November 2018, Shock sued Dr. Kettman and his clinic for defamation because of statements that Dr. Kettman made during his interviews with law enforcement officials. Paraphrasing from Dr. Kettman's interviews with the agents, Shock's petition alleged the following statements were defamatory: (1) Shock and his wife were "sharing pain pills"; (2) Shock "was using his position as a police officer to get Dr. Kettman to continue to prescribe" drugs for Shock; (3) Shock was a "dirty cop"; (4) Shock was "dishonest," and Dr. Kettman was worried about "pissing off a not-honest cop"; and (5) Shock "always avoided urinalysis tests."

In May 2023, Dr. Kettman and his clinic moved for summary judgment on three grounds, arguing the alleged defamatory statements were (1) "statutorily privileged, confidential, and inadmissible" under Iowa Code § 272C.6(4)(a) (2017);[3] (2) nonactionable opinion; and (3) protected from liability by the doctrine of qualified privilege. There was no statement of undisputed material facts annexed to the motion, *see* Iowa R. Civ. P. 1.981(8), although the brief included a detailed recitation of the facts with citations to the record. Shock resisted the motion, arguing among other things that the "procedural error of failing to file a separate statement of facts should merit denial." After the court held a hearing on the motion, Shock filed a motion for partial summary judgment, arguing the undisputed facts established that the challenged statements were false and defamatory per se.

In its October ruling, the district court found that Dr. Kettman's statements were not statutorily privileged under section 272C.6(4)(a) or nonactionable opinion. However, it agreed they were qualifiedly privileged. The court granted summary judgment to the defendants on that ground and dismissed Shock's lawsuit. The court did not address Shock's claim about the missing statement of

---

[3] Section 272C.6(4)(a) provides that

all complaint files, investigation files, other investigation reports, and other investigative information in the possession of a licensing board or peer review committee acting under the authority of a licensing board or its employees or agents which relates to licensee discipline are privileged and confidential, and are not subject to discovery, subpoena, or other means of legal compulsion for their release to a person other than the licensee and the boards, their employees and agents involved in licensee discipline, and are not admissible in evidence in a judicial or administrative proceeding other than the proceeding involving licensee discipline.

undisputed material facts. Nor did the court rule on Shock's summary judgment motion. Shock filed a motion under Iowa Rule of Civil Procedure 1.904(2), which the court summarily denied.

Shock appeals, claiming the district court erred in (1) "granting summary judgment upon Kettman's procedurally deficient motion"; (2) concluding the statements were qualifiedly privileged because Dr. Kettman "cannot establish he acted in good faith when he defamed Shock"; and (3) failing to grant Shock's motion for partial summary judgment. The defendants cross-appeal, challenging the court's denial of the two alternative grounds raised in their summary judgment motion.[4]

## II.    Standard of Review

Our supreme court recently outlined the standards for determining whether summary judgment is appropriate in a defamation case:

> We review a district court's summary judgment ruling for correction of errors at law. Summary judgment is appropriate when there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. Summary judgment is afforded a unique role in defamation cases. Judges have a responsibility to determine whether allowing a case to go to a jury would endanger first amendment freedoms.

*Bauer v. Brinkman*, 958 N.W.2d 194, 197 (Iowa 2021) (cleaned up).

---

[4] After the parties' appellate briefs were submitted, the defendants moved to strike two sections of Shock's reply brief that raised new arguments about the admissibility of summary judgment exhibits. We agree with the defendants that issues "cannot be asserted for the first time in a reply brief." *Young v. Gregg*, 480 N.W.2d 75, 78 (Iowa 1992). So we grant the motion to strike on that ground and do not consider Shock's new arguments further on appeal.

## III.    Analysis

### A.    Procedural Issues

This case requires us to wade into the complex waters of defamation law. *See Bierman v. Weier*, 826 N.W.2d 436, 473 (Iowa 2013) (Hecht, J., concurring in part and dissenting in part) ("The law of defamation is in disarray.  It is confusing. It is unclear." (citation omitted)).  But before we do so, we must address some procedural issues raised by both parties.

The first is Shock's claim that the district court erred in granting the defendants' summary judgment motion because it failed to include a "separate, short and concise statement of the material facts as to which the moving party contends there is no genuine issue to be tried," as required by Iowa Rule of Civil Procedure 1.981(8).  While we do not condone this omission, we conclude that it did not prejudice Shock.

A statement under rule 1.981(8) "does not constitute part of the record from which genuine issues of material fact may be determined."  *Glen Haven Homes, Inc. v. Mills Cnty. Bd. of Rev.*, 507 N.W.2d 179, 183 (Iowa 1993).  Instead, the statement is "intended to be a mere summary of claims that must rise or fall on the actual contents of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any.'"  *Id.* (quoting what is now rule 1.981(3)).  "If those matters do not reveal the absence of genuine factual issues, the motion for summary judgment must be denied."  *McVey v. Nat'l Org. Serv., Inc.*, 719 N.W.2d 801, 803 (Iowa 2006).  The brief in support of the summary judgment motion contained seventeen pages of facts, with supporting citations to the record before the district court.  We conclude Shock was not misled by the

absence of a separate statement under rule 1.981(8) "and may not make that omission a basis for reversal." *Glenn Haven Homes*, 507 N.W.2d at 183.

Second, we summarily reject Shock's claim that the district court erred in failing to grant his motion for partial summary judgment on whether the statements were defamatory per se and false. The introductory paragraph of the court's summary judgment ruling stated that "Shock's motion for summary judgment was submitted and considered without additional oral argument." But because the court did not rule on that motion, and Shock did not raise the issue in his rule 1.904(2) motion, the claim was not preserved for our review. *See Meier v. Senecaut*, 641 N.W.2d 532, 537 (Iowa 2002) ("It is a fundamental doctrine of appellate review that issues must ordinarily be both raised *and decided* by the district court before we will decide them on appeal." (emphasis added)).

Third, we deny the defendants' claim that "Shock's appeal fails because he has not even identified the alleged defamatory statements." The district court identified the five paraphrased statements that it considered in its ruling, which Shock repeated at the beginning of his argument on appeal.[5] So we find no merit to this claim.

## B.    Qualified Privilege

"Generally speaking, defamation is the publication of false statements of fact which tend to harm an individual's reputation." *Bauer*, 958 N.W.2d at 198.

---

[5] Although Shock recites those statements in his appellate brief, he does not make any argument or further address Dr. Kettman's statement that Shock always avoided urinalysis tests. We accordingly find any challenge to that statement waived and focus on Shock's arguments about the other four. *See Hyler v. Garner*, 548 N.W.2d 864, 870 (Iowa 1996) (confining the court's consideration to issues raised on appeal).

"The centuries-old tort . . . protects a person's common law 'interest in reputation and good name'" in a broad way.  *Bertrand v. Mullin*, 846 N.W.2d 884, 891 (Iowa 2014) (citation omitted).  It applies to both written and oral statements.  *Id.*  And it extends beyond the literal meaning of the communication, recognizing that it "is the thought conveyed, not the words, that does the harm."  *Id.* (citation omitted).

There are, however, limits on this broad tort.  *See Andrew*, 960 N.W.2d at 489.  For instance, some statements are "protected, or privileged, despite being libelous."  *Id.*  Defamation defendants are afforded privileges because

> [s]ometimes one is justified in communicating to others, without liability, defamatory information. . . . The law recognizes certain situations may arise in which a person, in order to protect his own interests or the interests of others, must make statements about another which are indeed libelous.  When this happens, the statement is said to be privileged, which simply means no liability attaches to its publication.

*Barreca v. Nickolas*, 683 N.W.2d 111, 117 (Iowa 2004) (quoting *Vojak v. Jensen*, 161 N.W.2d 100, 105 (Iowa 1968)).  "Privileged communications are divided into two main general classes, namely: (1) those that are absolutely privileged, and (2) those that are qualifiedly or conditionally privileged."  *See Mills v. Denny*, 63 N.W.2d 222, 224 (Iowa 1954).

The defendants' summary judgment motion raised the affirmative defense of qualified privilege, which the district court found applied as a matter of law.  In *Barreca*, our supreme court noted that its past cases "sometimes characterized [the] qualified privilege doctrine" as follows:

> A qualified privilege exists with respect to statements that are otherwise defamatory if the following elements exist: (1) the statement was made in good faith; (2) the defendant had an interest

to uphold; (3) the scope of the statement was limited to the identified interest; and (4) the statement was published on a proper occasion, in a proper manner, and to proper parties only.

683 N.W.2d at 118 (quoting *Winckel v. Von Maur, Inc.*, 652 N.W.2d 453, 458 (Iowa 2002)).

Relying on that four-factor test, the parties in *Barreca* disputed whether the challenged statement "was made in good faith, published on a proper occasion, in a proper manner, and only to proper parties." *Id.* The court did not address those issues, noting that "[a]lthough the parties continue to frame the issue this way, we do not." *Id.* Instead, citing Restatement (Second) of Torts § 593 (1977),[6] the court held, "Our task is simply to determine whether the occasion of [the] statement was qualifiedly privileged; if the occasion was so privileged, it must then be determined whether that privilege was abused." *Id.*; *see also Bandstra v. Covenant Reformed Church*, 913 N.W.2d 19, 48 (Iowa 2018) ("Qualified privilege may be lost, however, if the speaker abuses the privilege by speaking with actual malice or excessively publishing the statement 'beyond the group interest.'" (citation omitted)). "Generally, the former question is for the judge; the latter for the jury." *Barreca*, 683 N.W.2d at 118.

In defending the district court's conclusion that a qualified privilege applied to Dr. Kettman's statements, the defendants suggest that the court in *Barreca* replaced the four-factor test that considers whether the statement was made in

---

[6] The Restatement (Second) states that "[o]ne who publishes defamatory matter concerning another is not liable for the publication if (a) the matter is published upon an occasion that makes it conditionally privileged and (b) the privilege is not abused." Restatement (Second) of Torts § 593. Sections 594 through 598A detail occasions that make a publication "conditionally privileged."

good faith with the test from the Restatement that simply considers the "occasion" of the statement's publication. As Shock points out, however, at least one federal court has noted that "Iowa law in this area is not especially clear." *Farm Credit Servs. of Am., FLCA v. Tifft*, No. 8:18-CV-80, 2019 WL 10894120, at *5 (D. Neb. Dec. 31, 2019). In two cases after *Barreca*, the court continued to cite the four-factor test when discussing qualified privilege. *See, e.g.*, *Jones v. Univ. of Iowa*, 836 N.W.2d 127, 149 (Iowa 2013); *Bandstra*, 913 N.W.2d at 47–48. But in *Andrew*, the court only cited the truncated test from the Restatement—although qualified privilege was not at issue there. 960 N.W.2d at 489; *see also Reeder v. Carroll*, 759 F. Supp. 2d 1064, 1078 (N.D. Iowa 2010) (suggesting the Iowa Supreme Court abandoned the four-factor test in *Barreca* in favor of the Restatement approach). So where does this leave us?

We find that regardless of which test is used, the undisputed facts establish that a qualified privilege applies to Dr. Kettman's challenged statements. Looking at the Restatement test from *Barreca* first, section 598 of the Restatement describes what some courts call the public-interest privilege,[7] under which

> [a]n occasion makes a publication conditionally privileged if the circumstances induce a correct or reasonable belief that
> (a) there is information that affects a sufficiently important public interest, and
> (b) the public interest requires the communication of the defamatory matter to a public officer or a private citizen who is authorized or privileged to take action if the defamatory matter is true.

Restatement (Second) of Torts § 598; *see also Brown v. First Nat'l Bank*, 193 N.W.2d 547, 552–53 (Iowa 1972) (discussing a former version of this rule but

---

[7] *See, e.g.*, *Kelley v. Tanoos*, 865 N.E.2d 593, 600 (Ind. 2007); *Kennedy v. Sheriff of E. Baton Rouge*, 935 So. 2d 669, 682–83 (La. 2006).

finding it did not apply because the communication was made to the general public). A comment explains the rule "is applicable when any recognized interest of the public is in danger, including the interest in the prevention of crime and the apprehension of criminals." Restatement (Second) of Torts § 598, cmt. d; *see also Kennedy*, 935 So.2d at 683 ("[V]ital to our system of justice is that there be the ability to communicate to police officers the alleged wrongful acts of others without fear of civil action for honest mistakes.").

Our supreme court applied a variation of this rule more than one hundred years ago in *Fleagle v. Goddard*, which considered whether a defendant's statements to a federal agent who was investigating a fraud complaint against the plaintiff were qualifiedly privileged. 177 N.W. 51, 52 (Iowa 1920). In discussing the privilege, the court stated that

> if the statements complained of were made by defendant without malice, and with the reasonable belief that same were true, as they were made to the representative of the pension department of the government in the public interest and for the public good and in the discharge of his duty as a citizen, they were at least qualifiedly privileged.

*Id.* at 53 (affirming grant of directed verdict to the defendant on the ground of qualified privilege because nothing in the record showed that he made the challenged statements "without reasonable grounds of believing the same to be true, or that he acted maliciously").

Under *Fleagle* and the public-interest privilege set out in section 598 of the Restatement, we agree with the district court that Dr. Kettman's statements were qualifiedly privileged. As the court reasoned, Dr. Kettman had

> publicly-oriented interests in cooperating with the investigation, such as to protect other health care providers in the community and fulfill

his social responsibilities as a community member and citizen to help uncover illegal activity or public corruption. The investigating law enforcement officers had corresponding interests in receiving all potentially relevant information from Kettman regarding his treatment of, and prescription of medication to, Shock and Shock's wife in order to follow where it might lead and, if warranted after a complete investigation, file a criminal charge or charges, report official misconduct, or report disciplinary concerns.

*See Reeder*, 759 F. Supp. 2d at 1087 (finding a doctor's statements to the board of medicine were qualifiedly privileged because the board and the public "share a sufficiently important interest in ensuring the competency and safety of physicians practicing in the state of Iowa").

Yet Shock maintains the court "erroneously ruled as a matter of law that Kettman defamed Shock in good faith." To the extent that determining whether a qualified privilege exists still depends on whether the statement was made in good faith, we agree with the district court that the "record lacks evidence from which a reasonable finder of fact could conclude that Kettman's statements . . . were the product of insincerity or deception by Kettman rather than [his] desire to be honest and open with the investigating officers."

Shock challenges that conclusion, arguing the district court impermissibly "shifted Kettman's burden, as the movant, onto Shock" by finding that "Kettman *had* acted in good faith, based on a purported *lack* of evidence suggesting otherwise." We disagree. As we mentioned earlier, "the role of summary judgment in defamation cases is unique and the court's role is expanded." *Bitner v. Ottumwa Cmty. Sch. Dist.*, 549 N.W.2d 295, 300 (Iowa 1996). "The party resisting a motion for summary judgment must set forth specific facts to support the claim and only disputes over facts that might affect the outcome of the suit under the governing

law will properly preclude the entry of summary judgment." *Id.* (cleaned up); *see also Slaughter v. Des Moines Univ. Coll. of Osteopathic Med.*, 925 N.W.2d 793, 808 (Iowa 2019) (stating summary judgment "is the put up or shut up moment in a lawsuit, when a nonmoving party must show what evidence it has that would convince a trier of fact to accept its version of the events" (cleaned up)).

The undisputed facts show that Dr. Kettman made the challenged statements to state and federal special agents—twice while under a subpoena—after being informed about the results of the pharmacy board's investigation. That investigation revealed the Shocks had lied to Dr. Kettman about the "dummy prescription" and the drug taskforce investigation. The investigator also told Dr. Kettman that Candace "had mentioned to them that we don't have a problem with narcotics. My husband is in charge of destroying all the narcotics for the Cedar Valley take-back program, so if he . . . wanted them, he could just take them." According to Dr. Kettman, "that's what turned this Board of Pharmacy onto, okay, maybe we have a real problem here." Then, when Dr. Kettman tried to extricate himself from prescribing narcotic pain medication to the Shocks, they contacted an attorney about a lawsuit against the pharmacy board and its investigator. Candace also told Dr. Kettman that "she had powerful cousins on the Board of Pharmacy and Medicine, and that [Shock] was going to be getting a job with the DEA." And the Shocks falsely told Dr. Kettman that the pain specialist would not prescribe Candace any narcotic pain medication to secure a prescription from Dr. Kettman.

It was against this backdrop that Dr. Kettman told an agent from the Iowa Division of Criminal Investigation he thought Shock was

a dirty cop . . . honestly, if—a guy with these problems and his wife having these problems, whatever is going on with them is in charge of handling large quantities of narcotics, okay, what in the world is going on and what does it imply?  Your mind is kind of going slowly down with that.

Dr. Kettman continued explaining to the agent that he was worried about the ramifications of making a police officer mad, "[e]specially not an honest one anymore.  As we're getting away from giving them what they want and, you know, what are the retributions going to be?"  And knowing the large amount of pain pills from Candace's prescription monitoring program report, along with the pain specialist's concerns about Shock's prescription pill use, Dr. Kettman told the agent that he thought Candace "was adamant on pain pills, and then the large amount of pain pills, I personally think that they're sharing pills, I personally believe that she's got a big problem."

Without addressing this context for the challenged statements, Shock argues that Dr. Kettman's deposition testimony, discussed in more detail below, "eviscerates any claim that Kettman may have made the accusations in his interviews in good faith."  He contends that Dr. Kettman

> directly contradicted himself on the record and under oath, which not only calls his credibility into question, but also constitutes evidence from which a reasonable finder of fact would have to conclude that one or more of the statements were indeed insincere, deceptive, and not made in "good faith."

In response, the defendants argue that Shock conflates "good faith" with the second part of the test from *Barreca*—whether the privilege was abused.  We agree, although we note that "good faith" is not clearly defined in our caselaw on qualified privilege.

The court in *Barreca* stated that a "qualified privilege is abused, for example, when a defamatory statement is published with 'actual malice.'" *Barreca*, 683 N.W.2d at 117. "Actual malice" in this context means the defendant "published the statement with a knowing or reckless disregard of its truth."[8] *Id.* at 123. Shock argues that Dr. Kettman admitted at his deposition that he knew "of no criminal activity that would make Shock a 'dirty cop' and admits he has no evidence whatsoever to back up his claim that Shock was a 'dirty cop' or that he shared pain pills with his wife." (Cleaned up). But "failure to investigate before publishing, even when a reasonably prudent person would have done so, is not sufficient to establish reckless disregard." *Bertrand*, 846 N.W.2d at 895 (citation omitted). The statements must be made with a "high degree of awareness of their probable falsity." *Id.* at 894 (citation omitted). Stated another way, "There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication. Publishing with such doubts shows reckless disregard for truth or falsity and demonstrates actual malice." *Id.* (emphasis omitted) (quoting *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968)).

---

[8] Shock continues to characterize Dr. Kettman's statements as defamatory per se on appeal, although the district court did not rule on that issue. *See, e.g.*, *Barreca*, 683 N.W.2d at 116 (noting that statements imputing certain indictable crimes or incompetence in occupation are defamatory per se). But "[q]ualified privilege applies to publications without regard to whether they are defamatory per se." *Taggart v. Drake Univ.*, 549 N.W.2d 796, 803–04 (Iowa 1996). "The effect of the defense, when it is established, is to shift the burden to the plaintiff to prove actual malice in order to recover." *Vinson v. Linn-Mar Cmty. Sch. Dist.*, 360 N.W.2d 108, 116 (Iowa 1984) (distinguishing between legal malice, which is presumed with statements that are defamatory per se, and actual malice, which is at issue in determining whether a qualified privilege has been abused).

There is no such evidence in the record before us—just Dr. Kettman's after-the-fact acknowledgments in response to questions from Shock's counsel that he had "no direct or personal knowledge" that Shock "had ever done anything illegal or nefarious." *See Mills v. Iowa*, 924 F. Supp. 2d 1016, 1037 (S.D. Iowa 2013) (concluding an expert's "after-the-fact opinion that" a speaker's statements about the plaintiff were unfounded "does not establish that Defendants 'in fact entertained serious doubts' as to the truth of any of their statements"). We also note that in making those acknowledgements, Dr. Kettman tried to explain the grounds for his suspicions but was cut off by plaintiff's counsel.

Finally, Shock argues that Dr. Kettman admitted at his deposition "that he did not believe Shock had made any threats directly and had no recollection of having been directly extorted nor claiming as much." Thus, according to Shock, Dr. Kettman "cannot claim after that fact that he reasonably believed he had in fact been extorted." But Dr. Kettman told the special agents that there was "[n]o specific threat" from Shock and that the "threats he received were always indirect."

Viewing this evidence in the light most favorable to Shock, and affording him all reasonable inferences the record will bear, we agree with the district court that the

> record contains no evidence showing that Kettman realized the statements he made to the state and federal law enforcement officers were false but made them anyways. The record also lacks any evidence showing that Kettman entertained serious doubts about the truth of what he was telling the state and federal law enforcement officers about Shock but proceeded to make the statement despite having those serious doubts.

We accordingly affirm the court's summary judgment ruling for the defendants on their claim of qualified privilege. As a result, the defendants' cross-

appeal challenging the court's dismissal of their alternative defenses to Shock's defamation claim is moot.

**AFFIRMED ON APPEAL; CROSS-APPEAL DISMISSED AS MOOT.**